PEOPLE v BURWICK

Docket No. 98173. Argued January 11, 1995 (Calendar No. 9). Decided
    August 22, 1995.

Allen D. Burwick was convicted by a jury in the Calhoun Circuit
    Court, Conrad J. Sindt, J., of breaking and entering with intent
    to commit larceny. During trial, the court permitted the pros-
    ecutor to endorse a witness on the second day of trial. The
    Court of Appeals, D. E. HOLBROOK, JR., P.J., and MACKENZIE
    and R. L. TAHVONEN, JJ., affirmed in an unpublished memoran-
    dum opinion, holding that the trial court did not abuse its
    discretion in allowing the endorsement (Docket No. 140851).
    The defendant appeals.

    In an opinion by Justice BOYLE, joined by Chief Justice
BRICKLEY, and Justices RILEY and WEAVER, the Supreme Court
held:

    The prosecutor had no duty to discover the names of its
witnesses before trial.

    1. MCL 767.40a; MSA 28.980(1) does not impose an obligation
on the prosecutor to discover and produce unknown witnesses,
either by the exercise of due diligence or some lesser burden.
The prosecutor's former obligation to use due diligence to
produce any individual who might have any knowledge, favora-
ble or unfavorable, to either side, has been replaced by a
scheme that contemplates notice at the time of filing of the
information of known witnesses who might be called and all
other known res gestae witnesses, imposes on the prosecution a
continuing duty to advise the defense of all res gestae witnesses
as they become known, and directs that that list be refined
before trial to advise the defendant of the witnesses the pros-
ecutor intends to produce at trial. The prosecutor's duty to
produce res gestae witnesses has been replaced with an obliga-
tion to provide notice of known witnesses and reasonable
assistance to locate witnesses on a defendant's request. In this
case, the witness was not known to the prosecutor or the police.
The prosecutor had no legal duty to discover, endorse, or
produce her. Her belated discovery was for good cause shown.

    2. Rules of discovery are intended both to enhance the fair-
ness of the adversary system and to vindicate the principle that
the ends of criminal justice would be defeated if judgments

were to be founded on a partial or speculative presentation of the facts. Where there is a potential conflict between these interests, the trial court must balance the interests in fairness within the broader public interest in a full and truthful disclosure of critical facts. Where, as in this case, there is no cognizable prejudice to defendant in allowing endorsement, excluding the testimony would convert the salutary purpose of discovery into a weapon against the truth-determining function of the trial process.

3. The res gestae witness rule was abolished precisely because the notion of due diligence to produce at trial all res gestae witnesses had become a vehicle for claims that failure to use due diligence to locate, endorse, and produce witnesses required an adverse inference instruction or reversal on appeal. The prosecution must disclose material evidence favorable to the defense—even without a request, must advise the defendant of all known witnesses and those it discovers, must indicate which witnesses it will call at trial, and must provide reasonable assistance to produce witnesses it does not intend to call. A primary purpose of discovery is to enhance the reliability of the fact-finding process by eliminating distortions attributable to gamesmanship. Assuming a statutory violation, the court must weigh this paramount interest against the opposing parties' interests in an adequate opportunity to meet the proofs. The remedy is confided to the discretion of the trial court. In this case there is not even a colorable claim of abuse of the trial court's discretion.

Affirmed.

Justice LEVIN, joined by Justices CAVANAGH and MALLETT, dissenting, stated that the trial court abused its discretion in allowing the late endorsement of the prosecution's witness.

The decision to permit late endorsement of a prosecution witness should be evaluated on review by the standards enunciated in *People v Travis,* 443 Mich 668 (1993). To be considered is the amount of prejudice that resulted from the failure to disclose, the reason for nondisclosure, the extent to which the harm caused by nondisclosure was mitigated by subsequent events, the weight of the properly admitted evidence supporting the defendant's guilt, and other relevant factors arising out of the circumstances of the case.

The "good cause" standard does not provide a trial judge with unfettered discretion to permit endorsement. The multi-factored approach adopted in *Travis* provides a means of reviewing a trial judge's decision in light of the factual circumstances of a particular case. There is no longer a "due dili-

gence" requirement on the prosecution to locate unknown witnesses. The Legislature did away with this requirement by adopting the "good cause" standard. Nevertheless, the statute contemplates that the prosecutor will give advance notice of all known res gestae witnesses and specify before trial which known witnesses it intends to call. Providing advance notice requires the prosecutor to exercise some minimal level of diligence to comply with statutory disclosure obligations. Under the standards adopted in *Travis,* the reason for witness nondisclosure is but one factor to be considered in determining whether the trial judge correctly concluded that good cause had been shown.

There is potential for prejudice to a defendant's trial strategy whenever there is late endorsement of a witness by the prosecution, particularly when, as in this case, the defendant has elected a defense theory in an opening statement. It was the responsibility of the trial judge, in deciding whether to permit the late endorsement in the exercise of discretion, given the significance of the proposed testimony, to consider the extent to which the defendant's lawyer could have prepared to meet the testimony in the time allotted. Merely allowing the opportunity to interview a witness before testifying does not necessarily mitigate prejudice. Reviewing the record in light of the *Travis* standard, the trial court abused its discretion in permitting the late endorsement of the witness.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Jon Sahli,* Prosecuting Attorney, and *J. B. Jenkins,* Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Randy E. Davidson*) for the defendant.

BOYLE, J. Allen Dale Burwick was convicted of breaking and entering with intent to commit larceny.[1] The Court of Appeals affirmed.[2] We granted leave to appeal "limited to whether permitting the late endorsement of witness Timmons deprived

[1] MCL 750.110; MSA 28.305.

[2] Unpublished memorandum opinion, issued November 5, 1993 (Docket No. 140851).

[Burwick] of a fair trial."[3] Because the prosecutor had no duty to discover Timmons before trial, and there is no legally cognizable prejudice to defendant from Timmons' endorsement, we affirm the decision of the Court of Appeals.

I

Burwick was accused of breaking into the home of a girlfriend, Renee Green, on December 12, 1990, and stealing her television set and two shotguns belonging to her son, Darrial Goss. About six weeks before the trial, on March 6, 1991, the trial court entered an order requiring the endorsement of witnesses within fourteen days. The prosecutor provided a list on April 8, 1991, with six names.

The prosecutor indicated during jury voir dire that he would rely on circumstantial evidence linking Burwick to the break-in. The testimony would be that Burwick was familiar with Green's house, and that he was in possession of the stolen property. In his opening statement, the prosecutor stated that he would call the following witnesses: Renee Green to testify regarding her relationship with Burwick, and regarding events on the day of the incident; Darrial Goss to describe the guns and to testify that he identified the guns at the home of a family friend; Randy Evans, a family friend, to testify that he purchased guns from Burwick and then telephoned Kenneth Blunk, the boyfriend of Green's sister Rebecca Timmons, about his purchase; and David Holloway, the owner of a local appliance store and former boyfriend of one of Green's other sisters, to testify that someone had tried to sell him a television set on the evening of the break-in. Burwick's lawyer made a

[3] 446 Mich 868 (1994).

brief opening statement that the question was who did what and why.

On the second day of trial, the prosecutor moved to endorse Rebecca Timmons, Green's sister, as an additional witness. The prosecutor said that he was unaware that Timmons had evidence until he talked to Green the previous afternoon. The prosecutor said that Timmons had not been named in the police reports because the last report was dated December 19, 1990. Timmons would testify that Burwick confessed to her that he broke into Green's home. Burwick's lawyer opposed the endorsement, stating that he would need to investigate Burwick's whereabouts at the time Timmons claims Burwick spoke to her in an effort to establish an "alibi."

The judge granted the prosecutor's motion on the basis that Timmons' testimony was relevant and material. He conditioned the endorsement on Burwick's lawyer being provided an opportunity to speak with Timmons before she testified. The judge recessed to provide Burwick's lawyer with an opportunity to interview Timmons.[4]

After a brief recess, the judge inquired whether the length of the recess had been sufficient. Burwick's lawyer responded that it had. Before the trial resumed, Burwick's lawyer reiterated his objection to the endorsement of Timmons, citing the need for time to investigate Burwick's whereabouts at the time of the purported confession; he did not request a continuance.

Green testified that at about 5 P.M. on the day of the break-in she took Burwick, who had stayed overnight at her home, to his mother's home and

---

[4] The judge said that he would be willing to hear from Burwick's lawyer if he needed additional time after the interview. Burwick's lawyer requested that the prosecutor be present during the questioning.

then continued on with her children to the Timmons home in Battle Creek to bake Christmas cookies. Burwick had inquired whether Green's children would accompany her on the visit to her sister's house.

When Green returned home about 9:30 P.M., she found the knob of the front door broken and discovered her television and two shotguns missing. Green testified that she had received a telephone call from her sister four days after the break-in, reporting that another former boyfriend and Goss had seen the stolen guns at the home of a family friend, Randy Evans. Green then mentioned, for the first time, that Burwick had telephoned her before Christmas and confessed to having stolen the property, saying that he did not know why he did it, and that he was sorry but he had been hurt by Green. Green acknowledged that she had not told the police about the conversation, even when a police officer followed up with her two weeks later early in January.

Timmons testified that she had a telephone conversation with Burwick sometime on or after December 16, but before Christmas, and that Burwick said he was sorry and, in response to her question, admitted breaking into Green's house.

Testimony of the other witnesses was generally evasive and all failed to identify Burwick.

The jury convicted Burwick, and the trial court sentenced him to a seven- to fifteen-year term.[5] The Court of Appeals affirmed Burwick's conviction in an unpublished opinion[6] and we granted leave to appeal. Finding no error, we affirm the decision of the Court of Appeals.

[5] Burwick was an habitual offender. He did not testify.

[6] See n 2.

II

The issue is one of statutory construction. Our primary obligation is to determine the intent of the Legislature and to effectuate it. The statute in question, MCL 767.40a; MSA 28.980(1), does not impose an obligation on the prosecutor to discover and produce unknown witnesses, either by the exercise of due diligence or some lesser burden the dissent would engraft upon it.[7]

Before its amendment in 1986, MCL 767.40; MSA 28.980 was interpreted to require the prosecutor to use due diligence to endorse and produce all res gestae witnesses.[8] The amended statute creates four classes of witnesses: 1) witnesses *known* at the time of filing of the information who might be called at trial, 2) res gestae witnesses *known* to the prosecution or law enforcement officials at the time of filing of the information, 3) res gestae witnesses whose names later become known, and 4) witnesses the prosecutor determines he intends to call at trial. In pertinent part, the statute unambiguously provides first that

> [t]he prosecuting attorney shall attach to the filed information a list of all witnesses *known* to the prosecuting attorney who might be called at trial and all res gestae witnesses *known* to the prosecuting attorney or investigating law enforcement officers. [MCL 767.40a(1); MSA 28.980(1)(1) (emphasis added).]

The statute then provides:

> The prosecuting attorney shall be under a con-

---

[7] The Court of Appeals is divided on this question. *People v Canter,* 197 Mich App 550; 496 NW2d 336 (1992); *People v DeMeyers,* 183 Mich App 286; 454 NW2d 202 (1990), contra, decided before the effective date of Administrative Order No. 1990-6, 436 Mich lxxxiv. We approve the result and rationale of *People v Canter* at 562-563.

[8] *People v Baskin,* 145 Mich App 526; 378 NW2d 535 (1985).

tinuing duty to disclose the names of any further
res gestae witnesses as they become *known*. [MCL
767.40a(2); MSA 28.980(1)(2) (emphasis added).]

The statute next provides that the prosecutor shall
send to the defendant not less than thirty days
before trial

> a list of the witnesses the prosecuting attorney
> intends to call at trial. [MCL 767.40a(3); MSA
> 28.980(1)(3).]

It further provides that the list of witnesses the
prosecutor intends to call at trial may be amended
as follows:

> The prosecuting attorney may add or delete
> from the list of witnesses he or she intends to call
> at trial at any time upon leave of the court and for
> good cause shown or by stipulation of the parties.
> [MCL 767.40a(4); MSA 28.980(1)(4).]

Finally, to assist the defendant in locating and
serving witnesses, and without a showing of dem-
onstrated need or unsuccessful efforts on the part
of the defense, the statute provides that

> [t]he prosecuting attorney or investigative law en-
> forcement agency shall provide to the defendant or
> defense counsel, upon request, reasonable assis-
> tance, including investigative assistance, as may
> be necessary to locate and serve process upon a
> witness. [MCL 767.40a(5); MSA 28.980(1)(5).]

The prosecutor's former obligation to use due dili-
gence to produce any individual who might have
any knowledge, favorable or unfavorable, to either
side,[9] has been replaced by a scheme that 1) con-

_____
[9] *People v Buschard,* 109 Mich App 306; 311 NW2d 759 (1981).

templates notice at the time of filing the information of known witnesses who might be called and all other known res gestae witnesses, 2) imposes on the prosecution a continuing duty to advise the defense of all res gestae witnesses as they become known, and 3) directs that that list be refined before trial to advise the defendant of the witnesses the prosecutor intends to produce at trial. The prosecutor's duty to produce res gestae witnesses has been replaced with an obligation to provide notice of known witnesses and reasonable assistance to locate witnesses on defendant's request.[10]

The Legislature has thus eliminated the prosecutor's burden to locate, endorse, and produce unknown persons who might be res gestae witnesses and has addressed defense concerns to require the prosecution to give initial and continuing notice of all known res gestae witnesses, identify witnesses the prosecutor intends to produce, and provide law enforcement assistance to investigate and produce witnesses the defense requests.

The witness, Timmons, was not known to the prosecutor, or to the police. The prosecutor had no legal duty to discover, endorse, or produce her. Her belated discovery was for good cause shown. There being no prejudice to the defendant, the Court of Appeals decision must be affirmed.

_____

[10] Unquestionably, the prosecutor has a duty to adequately prepare the case. The duty owed, however, is imposed by the oath of office and is owed to the client, the public. Likewise, defense counsel owes a duty to the client, imposed by the Sixth Amendment, to provide the defendant with effective assistance of counsel. Neither the prosecution nor the defense has an affirmative duty to search for evidence to aid the other's case. The duty created by this statute is not to investigate for the benefit of the adversary, but to share the evidence that is discovered in fulfilling the prosecutor's and defense counsel's duties to their respective clients (subject of course to the provisions of the Fifth Amendment and the attorney-client privilege).

### III

In 1986, the Legislature amended MCL 767.40; MSA 28.980 to clarify and correct a considerable body of law unique "in the country, if not the world"[11] that had placed the burden on the prosecution to use due diligence to find, endorse and produce "res gestae" witnesses. The rationale of the amendment was to abolish the former approach, which "actually impedes, rather than contributes to, a fair trial, and that . . . serves no purpose except in defense counsel 'gamesmanship' to get a case dismissed or to lay the basis for a reversal." *Id.*[12]

Thus, as Justice GRIFFIN recently observed on behalf of a majority of this Court in *People v Hana, Gallina, Rode,* 447 Mich 325, 358, n 10; 524 NW2d 682 (1994), MCL 767.40a(4); MSA 28.980(1)(4), as amended, in pertinent part allows the prosecution to add to the list of witnesses it intends to call at trial "at any time upon leave of the court and for good cause shown." The dissent's premise that the endorsement of witness Timmons was "late" because the prosecution should have discovered her earlier is thus legally incorrect. Timmons' endorsement was not "late" unless the prosecution had a duty to learn about her at an earlier time.

As amended, the statute contemplates that the prosecutor will give advance notice of all *known* res gestae witnesses and specify before trial which *known* witnesses it intends to call. Having advised the defendant of all known witnesses and who among that list the prosecutor will produce at trial, the defense determines which known wit-

---

[11] Senate Analysis, SB 119 (1986 PA 46), March 26, 1986.

[12] The prosecutor has a constitutional obligation to disclose exculpatory material and to exercise due diligence before using prior testimony of a missing witness. Neither concept is implicated in this case.

nesses the prosecutor will not call and, upon request, the government must provide reasonable assistance "as may be necessary to locate and serve process . . . ." MCL 767.40a(5); MSA 28.980(1)(5).

Having thus fully addressed all known witnesses and provided for notice of their existence and a designation of who will be produced, the statute contemplates that the defense will seek production of the witnesses it desires and allows the prosecutor to delete from or add to the list of witnesses it will produce "at any time" as long as the good-cause requirement of MCL 767.40a(1); MSA 28.980(1)(1) is satisfied. The advance notice required by the statute is advance notice of witnesses *known* to the prosecution. Thus, strain as the dissent will, it can find no principled basis in the statute for an obligation to discover unknown witnesses.

Endorsement or deletion from this list is within the discretion of the trial court, reversible only for abuse.[13]

IV

After concluding that the statute imposes a duty to discover witnesses, the dissent would apply the five-part test of the alibi-witness statute construed in *People v Travis,* 443 Mich 668; 505 NW2d 563 (1993), and conclude that defendant was deprived

[13] Our court rule likewise requires that in the presentation of evidence the parties must comply with the Rules of Criminal Procedure and the Rules of Evidence. See MCR 6.416. The commentary explicitly recognizes that each party has discretion in deciding what witnesses and evidence to present. As the note explains, the rule

is consistent with a 1986 legislative enactment abrogating the prosecutor's duty to endorse and produce res gestae witnesses. See 1986 PA 46; MCL 767.40; MSA 28.980.

of a fair trial. The notice-of-alibi witness statute,[14] which we construed in *Travis,* and the "list of all witnesses" and "res gestae witnesses" statute,[15] deal with witnesses called at different stages in a trial, employ distinct language regarding the parties' obligations, and serve different policy goals.

First, as previously noted, the list-of-witness statute in plain language imposes no discovery requirement. The prosecutor's only burden of production is to produce those witnesses it intends to call, a list that can be amended on good cause shown, *at any time.* While the prosecutor has a continuing duty to give notice of all known res gestae witnesses and to advise the defendant of the witnesses it will produce, it is the defendant's responsibility to determine which witnesses it wants produced at trial.

The Legislature could have, but did not, condition the addition or deletion of the witnesses the prosecution would produce on a showing of prior due diligence. It could have, but did not, condition investigative assistance to the defense on defense counsel's due diligence in locating defense witnesses. Thus, the Legislature apparently intended to eliminate distortions to the truth-finding process at this stage of the proofs whether due diligence hurdles were advanced by the defense or the prosecution.

By contrast, the alibi-witness statute contains a section that specifically conditions endorsement of additional alibi witnesses on rebuttal:

> [A] showing by the moving party that the name of an additional witness was not available when the notice required by subsections (1) or (2) was filed and could not have been available by the

---

[14] MCL 768.20; MSA 28.1043.

[15] MCL 767.40a; MSA 28.980(1).

exercise of due diligence . . . . [MCL 768.20(3); MSA 28.1043(3).]

The Legislature apparently determined that the belated endorsement of alibi and rebuttal witnesses is much more likely to prejudice the prosecution or the defense than would the addition of non-alibi witnesses. Hence, the Legislature deemed that with respect to additional witnesses called to establish and rebut an alibi, each party must show due diligence as a condition for belated endorsement. Thus while rejecting the argument that the "due diligence" standard alone should be adopted as the controlling test for abuse of discretion in the addition of alibi or rebuttal witnesses, we recognized in *Travis* that diligence was part of the inquiry. *Id.* at 680-681.

The dissent suggests that *Travis* is appropriately applied here because *Travis* adopted the five-part test of *Myers*,[16] and *Myers* construed language identical to the good-cause language of MCL 767.40a; MSA 28.980(1). The observation perpetuates the selective omission of the words "at any time" appearing in MCL 767.40a(4); MSA 28.980(1)(4), thus obscuring the fact that both our notice-of-alibi statute and the federal rule impose an obligation to learn of alibi witnesses and implying that a similar obligation exists under the list-of-witness statute. There is no requirement to exercise due diligence under MCL 767.40a; MSA 28.980(1) to discover the names of witnesses, and we have neither authority nor reason to create one.

This is not to say that in a different situation the failure to grant a continuance upon discovery of a previously unknown witness could not constitute an abuse of discretion, *People v Charles O*

---

[16] *United States v Myers,* 550 F2d 1036, 1043 (CA 5, 1977), *post* at 306.

*Williams,* 386 Mich 565; 194 NW2d 337 (1972), or
that in certain circumstances the failure to declare
a mistrial at defendant's request because of preju-
dice to a defendant from production of such a
witness would not justify reversal. Cf. *United
States v Myers,* 550 F2d 1036, 1041 (CA 5, 1977).
However, we have recognized in an analogous
context that precluding evidence is an "extremely
severe" sanction limited to an egregious case. *Peo-
ple v Merritt,* 396 Mich 67, 82; 238 NW2d 31
(1976).

V

The trial court accepted the representation of
counsel that witness Timmons was not known to
the prosecution until the day before the motion,
that the name of the witness was not in the police
report, and that Timmons had never spoken to the
police. At this point in the trial, defense counsel
had done no more than make a two paragraph
opening statement that did not commit him to any
particular defense. After an adjournment to speak
to the witness, defense counsel said the interview
was "sufficient." Although observing that he would
have to investigate his client's whereabouts on two
Thursdays, defense counsel did not request a con-
tinuance.

The statute allows the prosecutor to add to the
list of witnesses "at any time" on good cause
shown. The trial court determined there was good
cause. Defendant did not request a continuance of
the trial and acknowledged that there was no
sandbagging.

VI

Assuming that the five factors considered in

*People v Travis, supra,* are the appropriate standard to review the addition of witnesses to be called in the case in chief, defendant was not deprived of a fair trial. First, and most importantly, the prosecutor did not violate any statutory duty. Thus, unlike the prosecutor in *Travis,* who did not endorse known rebuttal witnesses before trial because he had lost their names, the defendant does not dispute that the prosecutor had no indication that Timmons existed until after the first day of trial. Indeed, Green, the complainant, testified that she had failed to tell the officer who interviewed her about defendant's admissions to her and her sister because of ambivalent feelings regarding the defendant.[17] Second, the defendant has not shown that his case was severely prejudiced by the untimely disclosure. *Id.* at 683. In fact, there is no colorable claim that defendant would have proceeded any differently had advance notice been given.[18] A telephone call can be made at any time from anywhere and does not lend itself to an alibi. Third, assuming unlawful damage was caused, it was mitigated when the trial

[17] Her disclosure to the prosecutor occurred on the day she was allegedly threatened by friends of the defendant. While it is only speculation that this event caused the change of heart that prompted her disclosure, it is also speculation that had the prosecutor interviewed her earlier she would have disclosed the information.

[18] The dissent asserts that the defense was "foreclosed from presenting alternative defense theories" and that cross-examination of Timmons was "hampered . . . by his inability to investigate beforehand important issues, such as Timmons' credibility." *Post* at 310 and n 25. The record in this case, however, belies any assertion of prejudice.

First, defendant has never alleged an alternate defense theory other than that he might be able to create an alibi for the time when Timmons received his confession. Beyond a hypothetical alibi, defendant has never alleged any possible "alternative defense theory."

Second, at the beginning of the trial, defense counsel requested the criminal records of any witnesses the prosecution intended to call in order to obtain material to impeach the witnesses' credibility. Defense counsel, however, never requested Timmons' previous record, if there is one, and there is no indication that such a request would not have been granted.

court allowed the defendant to interview the witness before taking the stand. After doing so, defense counsel indicated that his interview had been sufficient to understand the nature of the testimony. While the defendant preserved his appellate claim by objecting to admission of the testimony, he did not request a continuance and still has not shown that a continuance would have produced any evidence to rebut the witnesses' testimony. Contrary to the dissent's speculation, defense counsel does not claim he was hampered in his efforts to cross-examine Timmons with respect to her credibility. Given that defense counsel requested and received information regarding the criminal convictions of prosecution witnesses, it is reasonable to conclude such potential specific impeachment of Timmons was nonexistent. In any event, appellant does not make this claim.

Finally, the amount of other evidence admitted against the defendant was compelling. In addition to circumstantial proof that the defendant committed the offense, there is no dispute that the entirety of complainant Green's testimony was properly admitted.[19] Green testified that the defendant called her and confessed that he had broken into her house.

### CONCLUSION

Rules of discovery are intended both to enhance the fairness of the adversary system, *Wardius v Oregon*, 412 US 470; 93 S Ct 2208; 37 L Ed 2d 82

[19] The dissent, however, incorrectly concludes that any effect on the defendant's anticipated defense from a change in the proofs in the case in chief is prejudicial. Defendant's case was damaged when the complainant, Green, unexpectedly testified that defendant had admitted to her that he had committed the crime, but there is no claim of "prejudice" from unfavorable testimony, and the dissent has not suggested otherwise.

(1973), and to vindicate the principle that the "ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts." *Taylor v Illinois,* 484 US 400, 411; 108 S Ct 646; 98 L Ed 2d 798 (1988), quoting *United States v Nixon,* 418 US 683, 709; 94 S Ct 3090; 41 L Ed 2d 1309 (1974). Where there is a potential conflict between these interests, the trial court must balance the interests in fairness within "the broader public interest in a full and truthful disclosure of critical facts." 484 US 412. Where, as here, there is no cognizable prejudice to defendant in allowing endorsement, excluding the testimony would convert the salutary purpose of discovery into a weapon against the truth-determining function of the trial process.

The res gestae witness rule was abolished precisely because the notion of due diligence to produce at trial all "res gestae" witnesses had become a vehicle for claims that failure to use due diligence to locate, endorse, and produce witnesses required an adverse inference instruction or reversal on appeal. The prosecution must disclose material evidence favorable to the defense—even without a request[20]—must advise defendant of all known witnesses and those it discovers, must indicate which witnesses it will call at trial, and must provide reasonable assistance to produce witnesses it does not intend to call. The dissent's attempt to resurrect "the fat lady"[21] from the legislative bone

[20] *United States v Agurs,* 427 US 97; 96 S Ct 2392; 49 L Ed 2d 342 (1976).

[21] The Senate Analysis cited "the fat lady" as an example of the abusive use of the former rule. In *People v Edward Charles* (Supreme Court Docket No. 72497), the defendant on appeal claimed lack of due diligence in the prosecutor's failure to locate and produce a missing "fat lady," who, a witness testified at trial, had seen the crime. The Court of Appeals in an unpublished opinion per curiam, remanded the case for a hearing to determine 1) whether the fat lady was a res gestae witness, 2) whether the prosecutor adequately attempted to

yard serves neither fair play nor truth.

A primary purpose of discovery is to enhance the reliability of the fact-finding process by eliminating distortions attributable to gamesmanship. Assuming a statutory violation, the court must weigh this paramount interest against the opposing parties' interests in an adequate opportunity to meet the proofs. Where a continuance can accomplish both objectives, it serves administrative efficiency and is the remedy of choice. In other circumstances, other methods of addressing the problem may be appropriate. In all events, the remedy is confided to the discretion of the trial court.

Given that there is no duty to discover res gestae witness, there was no statutory violation. In this case there is not even a colorable claim of abuse of the trial court's discretion.[22] Thus, we affirm the decision of the Court of Appeals.

BRICKLEY, C.J., and RILEY and WEAVER, JJ., concurred with BOYLE, J.

LEVIN, J. (dissenting). Allen Dale Burwick was convicted of breaking and entering with intent to commit larceny.[1] The Court of Appeals affirmed.[2] We granted leave to appeal "limited to whether permitting the late endorsement of witness Tim-

produce her for trial, 3) whether the defendant was prejudiced, and 4) if so, an appropriate remedy. Issued July 21, 1983.

[22] While the dissent accuses the majority of an "essentially standardless approach," it is the dissent who offers no explanation why the brief continuance offered by the court and accepted as satisfactory by the defense lawyer did not address the public interest, the court's interest, and the defendant's interest in a fair trial. *Post* at 308. The rule the dissent espouses is that the judge should have offered options the parties did not request, failing which the trial judge is to be reversed for not granting the extreme request the defendant made. The formulation can only be described as illogical.

[1] MCL 750.110; MSA 28.305.

[2] Unpublished memorandum opinion, issued November 5, 1993 (Docket No. 140851).

mons deprived [Burwick] of a fair trial."[3] We would reverse and remand for a new trial because we conclude that Burwick was so deprived of a fair trial.

I

Burwick was accused of breaking into the home of a girlfriend, Renee Green, on December 12, 1990, and stealing her television set and two shotguns belonging to her son, Darrial Goss. About six weeks before the trial, on March 6, 1991, the trial court entered an order requiring the endorsement of witnesses within fourteen days. The prosecutor provided a list on April 8, 1991, with six names.

The prosecutor indicated during jury voir dire that he would rely on circumstantial evidence linking Burwick to the break-in. The testimony would be that Burwick was familiar with Green's house, and that he was in possession of the stolen property.[4] Burwick's lawyer made a brief opening statement that the question was who did what and why. The lawyer concluded that the jury would come to the conclusion that Burwick "had been extremely wrongly treated or that the Prosecution has totally and completely failed to prove his guilt beyond a reasonable doubt."

On the second day of trial, the prosecutor moved to endorse Rebecca Timmons, Green's sister, as an

[3] 446 Mich 868 (1994).

[4] In his opening statement, the prosecutor stated that he would call the following witnesses: Renee Green to testify regarding her relationship with Burwick, and regarding events on the day of the incident; Darrial Goss to describe the guns and to testify that he identified the guns at the home of a family friend; Randy Evans, the family friend, to testify that he purchased guns from Burwick and then telephoned Kenneth Blunk, the boyfriend of Green's sister Rebecca Timmons, about his purchase; and David Holloway, the owner of a local appliance store and former boyfriend of one of Green's other sisters, to testify that someone had tried to sell him a television set on the evening of the break-in.·

additional witness. The prosecutor said that he was unaware that Timmons had evidence until he talked to Green the previous afternoon. The prosecutor said that Timmons had not been named in the police reports because the last report was dated December 19, 1990. Timmons would testify that Burwick confessed to her that he broke into Green's home. Burwick's lawyer opposed the late endorsement, stating that he would need to investigate Burwick's whereabouts at the time Timmons claims Burwick spoke to her in an effort to establish an alibi.

The judge granted the prosecutor's motion on the basis that Timmons' testimony was relevant and material. He conditioned the endorsement on Burwick's lawyer being provided an opportunity to speak with Timmons before she testified. The judge recessed for eleven minutes to provide Burwick's lawyer with an opportunity to interview Timmons.[5]

After the recess, the judge inquired whether the time had been sufficient. Burwick's lawyer responded that it had. Before the trial resumed, Burwick's lawyer reiterated his objection to the endorsement of Timmons, citing the need for time to investigate Burwick's whereabouts at the time of the purported confession.

Green testified that at about 5 P.M. on the day of the break-in she drove Burwick, who had stayed overnight at her home, to his mother's home and then continued on with her children to the Timmons home in Battle Creek to bake Christmas cookies. Burwick had inquired whether Green's

---

[5] The judge said that he would be willing to hear from Burwick's lawyer if he needed additional time after the interview. Burwick's lawyer requested that the prosecutor be present during the questioning.

children would accompany her on the visit to her sister's house.[6]

When Green returned home about 9:30 P.M., she found the knob of the front door broken and discovered her television and two shotguns missing.

Green also testified that she had received a telephone call from her sister four days after the break-in, reporting that another former boyfriend and Goss had seen the stolen guns at the home of a family friend, Randy Evans. Green then reported, for the first time, that Burwick had telephoned her before Christmas and confessed to having stolen the property, saying that he did not know why he did it, and that he was sorry but he had been hurt by Green.[7] Green acknowledged that she had not told the police about the conversation, even when a police officer followed up with her two weeks later early in January.

David Holloway, a local appliance store owner, testified that a man entered the store on the evening of the break-in and had tried to sell him a television set resembling Green's. Holloway did not purchase the set, but he overheard another man in the store discuss purchasing it and mention a name resembling Burwick's. Holloway did not recognize Burwick as one of the men who was in his store.

Goss testified that he identified the stolen guns at the home of a relative, Randy Evans. Evans testified that he had bought the guns from Clifford

---

[6] According to Green, she and Burwick had been dating for about two weeks before the incident. She claimed that she had had a discussion with Burwick in which she indicated that she thought that they should proceed more slowly. Green believed that Burwick wanted to move in with her and her children. Green said that Burwick did not have keys to the house, nor was he allowed to enter the house when she was not there.

[7] Apparently, her effort to "cool" their relationship. See n 6.

McLiechey[8] after someone at a bar had told him
that guns were for sale. Evans claimed that Mc-
Liechey indicated that he obtained them from a
man who identified himself as Burwick. Evans
could not identify Burwick in court. McLiechey
was not called to testify.[9]

The late-endorsed witness, Timmons, testified
that she had a telephone conversation with Bur-
wick sometime on or after December 16 before
Christmas. She said that she told Burwick that she
had spoken with his mother and that he should
call her because she was concerned about him. She
then said that Burwick asked her whether she
thought Randy would "drop it" if he got his money
back. Timmons assumed Burwick was referring to
the stolen guns. She said that, while they were
talking about Evans, Burwick said that he did not
know that Evans was related to her.

Timmons then testified that Burwick said he
was sorry and, in response to her question, admit-
ted having broken into Green's house. Timmons
conceded that she had not reported the confession
to the police, although she and Green both testi-
fied that she told Green about it well before
Christmas. She said that her mother was present
listening to her end of the conversation when she
spoke with Burwick. Her mother was not called to
testify.

The jurors deliberated for a day; they asked that
the testimony regarding Burwick's purported con-
fessions be read back, which was done. The jury
convicted Burwick, and the trial court sentenced

---

[8] Not Burwick, as asserted in the prosecutor's opening statement.
*Ante* at 284-285.

[9] There was no direct evidence supporting the prosecutor's assertion
in his opening statement that Burwick was in possession of the stolen
property. *Ante* at 284.

him to a seven- to fifteen-year term.[10] In affirming
the conviction, the Court of Appeals said:

> The trial court did not abuse its discretion in
> allowing the late endorsement of the prosecution's
> witness. *People v Canter,* 197 Mich App 550, 563;
> 496 NW2d 336 (1992). Defendant indicated at trial
> that he had sufficient time to interview the wit-
> ness. He did not demonstrate either at trial or on
> appeal any recognizable prejudice due to the late
> endorsement. See *People v Heard,* 178 Mich App
> 692, 696; 444 NW2d 542 (1989); *People v Hayden,*
> 132 Mich App 273, 291; 348 NW2d 672 (1984).
> [Unpublished memorandum opinion, issued
> November 5, 1993 (Docket No. 140851), slip op
> at 1.]

II

Before the Code of Criminal Procedure was
amended by 1986 PA 46, the prosecutor was re-
quired to endorse on the information the names of
witnesses known to him, and to produce them at
the trial.[11] Act 46 in effect retained the require-
ment that the prosecutor list witnesses known to
him, but eliminated the obligation to produce all
endorsed witnesses at trial, substituting an obliga-
tion to provide reasonable assistance to the ac-

---

[10] Burwick was an habitual offender. He did not testify.

[11] MCL 767.40; MSA 28.980.

> The purpose of the rule requiring the prosecutor to indorse
> on the information the names of all witnesses known to him at
> the time of filing the information, is to insure the whole of the
> res gestae and to protect the accused against the suppression of
> testimony favorable to him. [1A Gillespie, Michigan Criminal
> Law & Procedure (2d ed, 1986 rev vol 1), § 342, p 97. See *People
> v Tann,* 326 Mich 361, 366-367; 40 NW2d 184 (1949).]

See Gillespie, *supra,* pp 97-98. See also 22A CJS Criminal Law,
§ 459, pp 36-37.

cused to locate and serve process on a witness.[12]
Further, not less than 30 days before trial, the
prosecution must provide the defendant with a list
of witnesses to be produced at trial,[13] and the
prosecutor is under a continuing duty to disclose
further res gestae witnesses as they become

---

[12] MCL 767.40a; MSA 28.980(1), as revised by Act 46, provides as
follows:

(1) The prosecuting attorney shall attach to the filed informa-
tion a list of all witnesses known to the prosecuting attorney
who might be called at trial and all res gestae witnesses known
to the prosecuting attorney or investigating law enforcement
officers.

(2) The prosecuting attorney shall be under a continuing
duty to disclose the names of any further res gestae witnesses
as they become known.

(3) Not less than 30 days before the trial, the prosecuting
attorney shall send to the defendant or his or her attorney a
list of the witnesses the prosecuting attorney intends to pro-
duce at trial.

(4) The prosecuting attorney may add or delete from the list
of witnesses he or she intends to call at trial at any time upon
leave of the court and for good cause shown or by stipulation of
the parties.

(5) The prosecuting attorney or investigative law enforce-
ment agency shall provide to the defendant, or defense counsel,
upon request, reasonable assistance, including investigative
assistance, as may be necessary to locate and serve process
upon a witness. The request for assistance shall be made in
writing by defendant or defense counsel not less than 10 days
before the trial of the case or at such other time as the court
directs. If the prosecuting attorney objects to a request by the
defendant on the grounds that it is unreasonable, the prosecut-
ing attorney shall file a pretrial motion before the court to hold
a hearing to determine the reasonableness of the request.

(6) Any party may within the discretion of the court impeach
or cross-examine any witnesses as though the witness had been
called by another party.

See Gordon, *Death of the res gestae witness rule,* 67 Mich B J 282
(1988); Gillespie, n 11 *supra,* p 76 (1995 cum supp). Among the reasons
for the statutory amendment was that an inordinate amount of
prosecution resources were consumed in locating, with "due dili-
gence," witnesses that defendants usually could obtain through com-
pulsory process and who might never be called at trial by the defense.
See Senate Analysis, SB 119 (1986 PA 46), March 26, 1986.

[13] MCL 767.40a(3); MSA 28.980(1)(3).

known.[14] Names of witnesses may be added or deleted only *"upon leave of the court and for good cause shown* or by stipulation of the parties."[15]

This Court has not had occasion to review the propriety of a trial court's exercise of discretion in permitting endorsement under MCL 767.40a(4); MSA 28.980(1)(4).[16] However, in *People v Travis,* 443 Mich 668, 680-683; 505 NW2d 563 (1993), this Court considered a failure of the prosecution to provide adequate notice of rebuttal witnesses pursuant to the notice-of-alibi statute.[17] This Court said that, under the statute, the trial court had discretion to determine whether notice of alibi witnesses was timely "in view of the circumstances."[18] The Court said that the procedure for reciprocal discovery of witnesses provided "little more than a 'general alert' and must contemplate

[14] MCL 767.40a(2); MSA 28.980(1)(2).

[15] MCL 767.40a(4); MSA 28.980(1)(4) (emphasis added). See also *People v Wolford,* 189 Mich App 478, 483-484; 473 NW2d 767 (1991).

[16] Addressing the pre-1986 version of MCL 767.40; MSA 28.980, in *People v Wilson,* 397 Mich 76; 243 NW2d 257 (1976), the trial court permitted the trial day endorsement of two police chemists as witnesses and refused to grant the defendant a continuance to prepare for cross-examination. This Court found that the court had abused its discretion, not because of the decision to grant the late endorsement, but because of the trial court's refusal to grant a reasonable continuance. This Court concluded that the failure to grant a continuance infringed on the defendant's due process rights, that the defendant had a legitimate reason for asking for a continuance, that the defendant was not negligent, that there was no evidence of prior adjournments, and that the defendant demonstrated prejudice because he lost the ability to assert a possible defense by his inability to adequately cross-examine the chemist. *Id.* at 82-83.

Although our holding in *Wilson* was premised on the failure to grant a continuance, it is instructive with respect to the potential pitfalls of last-minute endorsement. First, late endorsement of a witness may violate a defendant's constitutional rights in the absence of an effective remedy enabling the defendant to adequately prepare his case. Further, a defendant may establish prejudice on the basis of loss of a possible defense resulting from inadequacies in defense counsel's ability to cross-examine the newly endorsed witness.

[17] MCL 768.20; MSA 28.1043.

[18] *Id.* at 679.

that such limited disclosure would not eliminate the element of surprise in many cases."[19] The Court declined to adopt a strict "due diligence" standard in reviewing the reasonableness of late notice and the exercise of trial court discretion, in favor of the five-part standard enunciated by the United States Court of Appeals for the Fifth Circuit in *United States v Myers,* 550 F2d 1036, 1043 (CA 5, 1977), where the court said:

> "In determining how to exercise its discretionary power to exclude the testimony of undisclosed witnesses . . . a district court should consider (1) the amount of prejudice that resulted from the failure to disclose, (2) the reason for nondisclosure, (3) the extent to which the harm caused by nondisclosure was mitigated by subsequent events, (4) the weight of the properly admitted evidence supporting the defendant's guilt, and (5) other relevant factors arising out of the circumstances of the case." [*Travis* at 682.]

The Court concluded that the *Myers* test provided an appropriate standard for the following reasons:

> This test takes into account not only the diligence of the prosecution, but also the conduct of the defendant and the degree of harm done to the defense. It tends to protect the prosecution in cases where the defendant is at fault or where the defendant suffers little or no prejudice. At the same time, it tends to protect the defendant when the conduct of the prosecution unfairly limits the defendant's choice of trial strategy. . . .[20]

Although there are differences between the stat-

---

[19] *Id.*
[20] *Id.* at 683.

utory obligations under the notice-of-alibi statute[21] and the statutory obligations under the statute here at issue,[22] the considerations that led this

---

[21] MCL 768.20; MSA 28.1043.

[22] The majority contends that the notice-of-alibi statute was designed to serve different policy goals from the witness notification statute at issue here. It so reasons because of linguistic differences between the statutes and opines that "[t]he Legislature apparently determined that the belated endorsement of alibi and rebuttal witnesses is much more likely to prejudice the prosecution or the defense than would the addition of non-alibi witnesses." *Ante* at 293.

The United States Supreme Court found a similarity between the purposes of alibi notification and witness discovery statutes. *Taylor v Illinois,* 484 US 400, 410-412; 108 S Ct 646; 98 L Ed 2d 798 (1988). The Court said:

> Rules that provide for pretrial discovery of an opponent's witnesses serve the same high purpose [as the accused's right to compulsory process]. Discovery, like cross-examination, minimizes the risk that a judgment will be predicated on incomplete, misleading, or even deliberately fabricated testimony. The "State's interest in protecting itself against an eleventh hour defense" is merely one component of the broader public interest in full and truthful disclosure of critical facts. [*Id.* at 411-412.]

The Court also observed that

> [t]he adversary process could not function effectively without adherence to rules of procedure that govern the orderly presentation of facts and arguments to provide each party with a fair opportunity to assemble and submit evidence to contradict or explain the opponent's case. [*Id.* at 410-411.]

The majority further contends that application of the *Travis* standard is inappropriate because the text of MCL 767.40a(4); MSA 28.980(1)(4) permits late endorsement "for good cause shown," unlike MCL 768.20(3); MSA 28.1043(3), respecting notice-of-alibi, which requires "due diligence" on the part of the party seeking belated endorsement. *Ante* at 291-294.

This Court adopted the five-part *Myers* test in *Travis,* despite linguistic differences between MCL 768.20(3); MSA 28.1043(3) and FR Crim P 12.1(e), which permits a court to grant an exception from the alibi witness disclosure requirements "for good cause shown." The *Travis* Court stated that it was "[m]indful of the linguistic differences between our statute and the federal rule," but nevertheless thought that "the *Myers* test provides an appropriate standard by which to judge the exercise of discretion vested in the trial court by our notice-of-alibi statute." *Id.* at 682-683. Thus, given the identical "good cause" language employed by both FR Crim P 12.1 and MCL 767.40a; MSA

Court in *Travis* to adopt the *Myers* five-part standard are also relevant in the context of the late endorsement of witnesses who are not alibi witnesses.

### III

The majority's reading of "for good cause shown" would transform that standard to a "for any cause shown" standard. The "good cause" standard does not provide a trial judge with unfettered discretion to permit endorsement. The multifactored approach adopted in *Travis* provides a means of reviewing a trial judge's decision in light of the factual circumstances of a particular case. That approach is preferable to the essentially standardless approach offered by the majority, since "whether the trial court has abused its discretion 'varies with the facts of each case, and must inevitably involve a weighing of the competing interests involved.'" *Travis* at 681 quoting *People v Merritt,* 396 Mich 67, 82; 238 NW2d 31 (1976).

We agree with the majority that there is no longer a "due diligence" requirement on the prosecution to locate unknown witnesses. The Legislature did away with this requirement by adopting the "good cause" standard. Using the majority's metaphor,[23] the fat lady has already sung and we have no thought of bringing her back for an encore.

Nevertheless, as the majority observes, the statute "contemplates that the prosecutor will give *advance notice* of all known res gestae witnesses and specify before trial which known witnesses it

28.980(1), adoption of the discretionary standard employed by the *Myers* court would be equally appropriate in the instant case.

[23] *Ante* at 297.

intends to call."[24] (Emphasis added.) Providing "advance notice" requires the prosecutor to exercise some minimal level of diligence to comply with his statutory disclosure obligations. As the United States Supreme Court observed, "Routine preparation involves location and interrogation of potential witnesses and the serving of subpoenas on those whose testimony will be offered at trial. The burden of identifying them in advance of trial adds little to these routine demands of trial preparation." *Taylor v Illinois*, 484 US 400, 415-416; 108 S Ct 646; 98 L Ed 2d 798 (1988).

Under the standards this Court adopted in *Travis*, the reason for witness nondisclosure is but one factor to be considered in determining whether the trial judge correctly concluded that good cause had been shown. The majority seeks to cast doubt on our conclusion that Timmons' endorsement deprived Burwick of a fair trial by focusing on only one of the five *Travis* factors and by mischaracterizing the application of *Travis* in this opinion. It incorrectly asserts that this opinion would resurrect the due diligence requirement eliminated by the amendatory legislation.

IV

Reviewing the record in the instant case in light of the *Travis* standard, we conclude that the trial court abused its discretion in permitting the late endorsement of Rebecca Timmons.

There is potential for prejudice to a defendant's trial strategy whenever there is late endorsement of a witness by the prosecution, particularly when, as here, the defendant has already locked himself into a defense theory in an opening statement. Before the second day of trial, Burwick's lawyer

---

[24] *Ante* at 290.

was unaware of Burwick's purported confessions to Green and Timmons. Until then, the prosecutor's statements to the jury were that the evidence was circumstantial and would be used to link Burwick to the burglary. In his opening statement, Burwick's lawyer appeared to pursue a simple strategy to the effect that the evidence was insufficient and not worthy of belief.

In response to the prosecution's motion to endorse Timmons, Burwick's lawyer suggested that Burwick might be able to establish an alibi at the time Timmons would testify she spoke with him. Whether such an alibi could have been established, the introduction of a witness testifying that Burwick confessed presented a significantly different factual scenario from that originally envisioned by Burwick's lawyer. The damaging nature of the testimony, combined with the late timing of disclosure, left Burwick's counsel fewer options. Since the late endorsement occurred after opening statements, Burwick's lawyer was foreclosed from presenting alternative defense theories before the jury heard the testimony of the newly endorsed prosecution witness.[25]

Turning to the reason for nondisclosure, the prosecutor said that he had only learned of Timmons and of her conversation with Burwick in the afternoon of the first day of trial. Green testified that Burwick confessed to her that he had burgled her home, and that Timmons had reported to Green the confession to her, within a week after the burglary, around December 20. No police report was filed after December 19, 1990. Between that time and the first day of trial, April 16, 1991,

_____
[25] While Burwick's lawyer cross-examined Timmons concerning her conversation with Burwick, he was hampered in doing so by his inability to investigate beforehand important issues, such as Timmons' credibility. See also *Wilson*, n 16 *supra*.

there had been at least one police visit to Green on December 27, 1990.

These facts suggest inadvertence on the part of the prosecutor, although we note that, the interview between the prosecutor and Green that elicited the information that Burwick had confessed to Green and Timmons could have occurred at almost any time during the four-month interval between the confessions and the date of trial.

To be sure, Green was not the prosecutor's client, but she was the complaining witness.[26] If the mutual obligations of the parties to disclose the names of witnesses before trial[27] are to serve the purpose of mutual discovery of the names of witnesses who may be called, counsel for both parties, the prosecutor as well as the defendant, should make some minimal attempt to learn the names of witnesses known to the protagonists.[28]

In reviewing the extent of mitigation, we recognize that the trial court permitted Burwick's lawyer to interview Timmons and that Burwick's lawyer initially said that the allotted time had been sufficient. In *State v Wilson,* 91 Ohio App 3d 611, 616-617; 632 NE2d 1384 (1993), the court observed that "[e]ffective representation generally

[26] The majority suggests that Green failed to inform the investigating officer of Burwick's purported confessions because of ambivalent feelings towards Burwick. *Ante* at 295. The majority further speculates that alleged threats might have been the reason why Green chose to make her disclosure to the prosecutor after the first day of trial and asserts that it is similarly speculative to assume that Green would have made such disclosure had she been interviewed earlier by the prosecutor. *Ante* at 295, n 17.

[27] On November 16, 1994, this Court adopted MCR 6.201 effective January 1, 1995, 447 Mich cxlvi. The rule provides that in a criminal case a party upon request must provide all other parties with the "names and addresses of all lay and expert witnesses whom the party intends to call at trial . . . ."

[28] There is no suggestion that the prosecutor wilfully failed to disclose before trial that Timmons might testify. If the failure to disclose had been wilful, this would be a stronger factor in favor of preclusion of the belatedly endorsed witness.

requires more than an interview in a courthouse hallway; it may require a more lengthy investigation to determine not only what evidence the witness would offer, but also the facts relevant to the witness's credibility."

While falling short of moving for a continuance, Burwick's lawyer communicated to the trial judge that more time was necessary to prepare to defend against Timmons' testimony. It was the responsibility of the trial judge, in deciding whether to permit the late endorsement in the exercise of discretion, to consider, given the significance of the proposed testimony, the extent to which Burwick's lawyer could have prepared to meet the testimony in the time allotted. As this Court observed in *Travis, supra* at 684, merely allowing the opportunity to interview a witness before testifying does not necessarily mitigate prejudice, especially where the defense has already announced a strategy in its opening statement.

Turning to an assessment of the weight of the properly admitted evidence, the prosecution's evidence was circumstantial and weak. There was no direct evidence of Burwick's involvement in the crime, no forensic evidence such as fingerprints. Each of the witnesses who testified, except for the police witnesses, were related in some way to Green. Neither Evans nor Holloway could identify Burwick as the person who offered to sell stolen goods. Without the confessions, the evidence only slightly linked Burwick to the crime.[29]

___

[29] The investigating officer asked Green to supply the serial numbers of the stolen guns, but she did not do so. He obtained numbers of the guns recovered from the Evans' home that were said to belong to Green's son, Goss. It does not appear that the television set was ever located or found.

Green testified that her neighbor noticed a big automobile in the driveway on the night of the break-in. She testified that she had a conversation with Burwick later that night during which she asked

The effect of the testimony concerning confessions is underscored by the jury's request that Green's and Timmons' testimony be read back. Green's report that Burwick had confessed might very well have been discounted by the jury because of her prior relationship with Burwick and her interest. Although Timmons was Green's sister, the jurors may have seen her testimony as more credible. The belated endorsement of Timmons may very well have turned the scales of justice against Burwick.

> "A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . .' *Bruton v United States,* 391 US [123, 139-140; 88 S Ct 1620; 20 L Ed 2d 476 (1968)] (White, J., dissenting). . . . While some statements by a defendant may concern isolated aspects of the crime or may be incriminating only when linked to other evidence, a full confession in which the defendant discloses the motive for and means of the crime may tempt the

him what automobile he had been driving. Although she testified that Burwick became defensive, this information was not provided to the police. In her conversations with the investigating officer, Green first said that she believed her house had been entered through a broken basement window, and then, later, through a door to the garage. Green claimed that her home had been previously broken into through the garage door by another former boyfriend, although no charges were ever officially filed.

Green did not tell the investigating officer about her and Timmons' conversations with Burwick, during the course of which they claimed he confessed, when she was interviewed by the officer on December 27, 1990, seven days after the conversations were said to have occurred.

Green testified that she initially did not tell Timmons about her conversation with Burwick when Timmons called about Burwick's confession to Timmons, and was unable to be specific concerning when she did relate to Timmons this important conversation.

Soon after the break-in, Green told the investigating officer she believed she had homeowners' insurance for the contents. She testified that she thought the insurance would cover the loss, and was dismayed to learn that the policy only covered the building structure.

jury to rely upon that evidence alone in reaching
its decision."[30] [*People v Dunn*, 446 Mich 409, 423;
521 NW2d 255 (1994).]

V

We agree with the following statement by the
majority:

> A primary purpose of discovery is to enhance
> the reliability of the fact-finding process by elimi-
> nating distortions attributable to gamesmanship.
> Assuming a statutory violation, the court must
> weigh this paramount interest against the oppos-
> ing parties' interests in an adequate opportunity to
> meet the proofs. Where a continuance can accom-
> plish both objectives, it serves administrative effi-
> ciency and is the remedy of choice. In other cir-
> cumstances, other methods of addressing the prob-
> lem may be appropriate. In all events, the remedy
> is confided to the discretion of the trial court.
> [*Ante* at 298.]

In reviewing a claim by a defendant that preclu-
sion is not an appropriate sanction for violation of
a discovery rule providing for witness disclosure,
the United States Supreme Court said:

> It may well be true that alternative sanctions
> are adequate and appropriate in most cases, but it
> is equally clear that they would be less effective
> than the preclusion sanction and that there are
> instances in which they would perpetuate rather
> than limit the prejudice to the State and the harm
> to the adversary process. One of the purposes of
> the discovery rule itself is to minimize the risk

---

[30] Quoting *Arizona v Fulminante*, 499 US 279, 313; 111 S Ct 1246;
113 L Ed 2d 302 (1991) (White, J., with Marshall, Blackmun and
Stevens, JJ., concurring).

that fabricated testimony will be believed. [*Taylor* at 413.]

We see no reason why this principle should not apply when *either* party seeks belatedly timed endorsement of a witness. The trial judge had the discretion to fashion a remedy to mitigate any potential unfairness resulting from the timing of endorsement. Depending on the circumstances, a continuance may or may not be appropriate. In some cases, preclusion remains a potential remedy.

To be sure, preclusion is a harsh sanction that should be used sparingly. In the instant case, the parties argued extreme positions. The prosecution requested endorsement, and the defense called for preclusion. The trial judge could have offered options between those extremes. Given the brevity of the trial, the trial judge could have offered the parties a continuance or the defense the option of moving for a mistrial as an intermediate position.

## VI

We would hold that the decision of a trial court to permit the late endorsement of a prosecution witness should be evaluated by the standards enunciated in *Travis*. We conclude that the trial court abused its discretion in allowing the testimony of Timmons, and that the error was not harmless.[31] We would reverse and remand for a new trial.

CAVANAGH and MALLETT, JJ., concurred with LEVIN, J.

---

[31] This is not to say that Timmons could not testify on retrial. Our decision is premised on our conclusion that the decision of the trial judge to permit her late endorsement in the midst of a short trial denied Burwick a fair trial in the circumstances.