# Order

**Michigan Supreme Court**
**Lansing, Michigan**

January 16, 2009

136437

Marilyn Kelly,
Chief Justice

Michael F. Cavanagh
Elizabeth A. Weaver
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman
Diane M. Hathaway,
Justices

PEOPLE OF THE STATE OF MICHIGAN,
        Plaintiff-Appellant,

v                                          SC: 136437
                                           COA: 270938
                                           Bay CC: 01-001129-FC
DONNA ALICE YOST,
        Defendant-Appellee.
_____/

On order of the Court, the application for leave to appeal the March 27, 2008 judgment of the Court of Appeals is considered, and it is DENIED, because we are not persuaded that the questions presented should be reviewed by this Court.

MARKMAN, J. (*concurring*).

Although defense counsel, in my judgment, committed several discovery violations, what I view as most significant about this case is the trial court's exclusion of the testimony of three key defense witnesses. I believe that the exclusion of this testimony constituted harmful error and deprived defendant of the ability to fully and fairly defend herself at trial. In light of Justice Corrigan's thoughtful dissent, I write separately to briefly explain why, in my view, the Court of Appeals analysis is correct.

First, I am concerned that the trial court's exclusion of the testimony of Dr. Firoza VanHorn, defendant's psychologist, deprived defendant of her ability to present a meaningful defense as to why she had demonstrated no emotion in the wake of her daughter's death. Throughout the trial, the prosecutor invoked defendant's apparent lack of emotional response in the moments and days following her daughter's death as being indicative of her guilt. Dr. VanHorn's testimony was critical in attempting to explain that defendant's unusual emotional responses were not indicative of guilt, but rather were characteristic of defendant's general inability to properly express emotions when faced with difficult life situations. The prosecutor argued that Dr. VanHorn's testimony was being offered as proof of "diminished capacity," which this Court has held is no longer a viable defense. See *People v Carpenter*, 464 Mich 223, 226 (2001). However, this argument misunderstands the true purpose for which the testimony was offered, which

was to explain that defendant does not display emotions in a normal manner. The prosecutor repeatedly referenced defendant's lack of emotional reactions in front of the jury, most notably during closing arguments. By depriving defendant of the principal means available to her to explain her inability to respond in a normal fashion to her daughter's death, defendant was seriously undermined in her ability to respond to the prosecutor and to present a meaningful defense.

Justice Corrigan argues in her dissent that the trial court properly limited the testimony of Dr. VanHorn, because it "could have properly excluded Dr. VanHorn from testifying at all" in light of the fact that defense counsel "sprung Dr. VanHorn [on the prosecutor] during trial on March 23, 2006, after the prosecution had already rested its case." However, because the prosecutor had actual notice of Dr. VanHorn, I respectfully disagree. On February 21, 2006, the trial court posed the following question to the prosecutor in regard to defendant's motion to add Dr. VanHorn: "So you're not objecting to . . . Dr. Firoza Vanhorn?" The prosecutor responded, "correct." Further, the prosecutor admitted that "as far as . . . VanHorn, Mr. Czuprynski [defense counsel] did provide an amended witness list, that's dated March 2nd of 2005; we received notice of that." In other words, the prosecutor admittedly had more than a year of actual notice that defense counsel intended to call Dr. VanHorn as a witness, and waived any objection to this.[1] Thus, I do not believe that defendant's failure to formally request that Dr. VanHorn be added as a witness, which was required by court order, was indicative of bad faith.

Second, I also believe that the trial court erred by excluding significant portions of Roxanne Davis's testimony. Just as with Dr. VanHorn, Davis's excluded testimony was not offered to show defendant's intellectual limitations, but was offered, and should have been admitted, to show that defendant's emotional reactions to traumatic events were

---

[1] Justice Corrigan also argues that defense counsel "failed to provide the prosecutor with any information whatsoever concerning expert reports prepared by [Dr. VanHorn] . . . [and] the prosecutor specifically objected to Dr. VanHorn's testimony on March 23, 2006 because defense counsel only informed the prosecutor that Dr. VanHorn would testify about defendant's diminished capacity, a defense explicitly precluded by an earlier ruling." I respectfully disagree with this assessment of the record. Significantly, it was the *prosecutor* who characterized Dr. VanHorn's testimony as pertaining to diminished capacity, not defense counsel. Additionally, the fact that the prosecutor was, in fact, able to object as it did to Dr. VanHorn's proposed testimony suggests, although the record is by no means dispositive, that defense counsel *did* provide the prosecutor with "a written description of the substance of the proposed testimony of the expert, the expert's opinion" and perhaps "the underlying basis of that opinion," which is an acceptable alternative, under MCR 6.201(A)(3), to "a report by the expert." Once again, I do not view a relatively minor evidentiary violation (i.e., failing to produce an actual report), as justifying the extreme remedy of exclusion.

abnormal, including, implicitly, her reaction to her daughter's death. Although, as Justice Corrigan points out, defense counsel was allowed to reference defendant's limited intellectual abilities on several occasions, this is distinct from being allowed to present evidence of defendant's ability to display normal emotions. An individual with limited intellectual functions may have completely normal emotional reactions, while an individual with above-average intelligence may not have the ability to normally express emotions. Because Davis was prevented from testifying about defendant's inability to *express emotions* in a normal fashion, the trial court erred. Once again, because the prosecutor used this evidence extensively as an indicator of defendant's guilt, the defendant was undermined in her ability to respond to the prosecutor and to present a meaningful defense.

Third, I believe that the trial court erred by preventing Dr. Bernie Eisenga, a toxicologist, from testifying. Dr. Eisenga was the only expert who could have informed the jury that Monique had ingested as few as 30 pills of Imipramine as compared to the prosecutor's theory that she had taken as many as 120. Although I share Justice Corrigan's concern that defense counsel violated the trial court's order by failing to identify Dr. Eisenga at least 30 days before trial, I nevertheless believe that the trial court erred by preventing Dr. Eisenga from testifying. In determining whether a defendant's expert should be precluded from testifying, this Court has held that the sanction of preclusion is extreme and should be limited to only the most egregious cases. *People v Merritt*, 396 Mich 67, 82 (1976). In determining whether exclusion is proper, the trial court should examine whether the other party will be severely prejudiced by the untimely disclosure. *People v Burwick*, 450 Mich 281, 296 (1995).

In context, this discovery violation does not appear to be a most egregious case, given that defendant's original pathologist retired, thereby requiring that defense counsel obtain a new pathologist, Dr. Steven Cohle. Dr. Cohle then opined that defendant's daughter may have ingested *significantly* fewer pills of Imipramine than both the prosecutor's experts and defendant's prior pathologist had estimated. Indeed, Dr. Cohle stated that defendant's daughter could have taken as few as 30 pills, which may not have been fatal and would provide additional support that her death was not the result of a homicide, but was instead due to a heart defect. In light of this conclusion, Dr. Cohle recommended that defendant obtain an expert toxicologist to testify about the number of pills in her daughter's system, which triggered defendant's request to add Dr. Eisenga relatively shortly before trial. Under these circumstances, I do not believe that defendant was attempting to ambush the prosecutor. Rather, it was not until the eve of trial that defense counsel realized that a toxicologist was needed to rebut the opinion of the prosecutor's experts that defendant's daughter had ingested up to 120 pills. Further, the prosecutor had already secured a toxicologist who could have been used to refute Dr. Eisenga's testimony. Thus, it is unclear how the prosecutor would have been prejudiced, much less "severely" so, by the introduction of Dr. Eisenga's testimony.

Further, other testimony indicating that defendant's daughter had probably taken fewer pills than the prosecutor's experts suggested does not render the trial court's exclusion of Dr. Eisenga's testimony harmless. Without expert testimony about the exact number of pills taken by the daughter, the jury had no way of determining the *extent* or *magnitude* by which the prosecutor's experts overestimated the amount of Imipramine in her system at the time of her death. A difference of as many as 90 pills constitutes a substantial overestimation, which may well have caused the jury to conclude that there was a reasonable doubt concerning whether this was actually a homicide. This error, too, was not harmless.

In sum, the trial court's exclusion of the testimony described above effectively prevented defendant from mounting *any* defense to the two most damaging pieces of evidence used by the prosecutor: defendant's apparent lack of concern after her daughter's death and the existence of 120 pills of Imipramine in her daughter's system. The effective operation of our criminal justice system depends on the discovery of the truth, and evidence is the lifeblood of this pursuit. I believe that the trial court erred in depriving the fact-finder of available evidence and, as a result, deprived defendant of a fair trial, and deprived the people of a criminal justice system in which the discovery of the truth was facilitated.

For these reasons, I agree with the Court of Appeals that defendant is entitled to a new trial.

CORRIGAN, J. (*dissenting*).

I respectfully dissent from the order denying the prosecutor's application for leave to appeal. I would grant leave to appeal to consider whether the Court of Appeals erred when it determined that the trial court's alleged errors required reversal of defendant's first-degree murder conviction after a nearly seven week trial. *People v Yost*, 278 Mich App 341 (2008). I do not believe that the trial court abused its discretion in its various evidentiary rulings. Even if errors occurred, they were harmless, particularly in light of the gamesmanship displayed by the defense regarding violations of discovery orders.[2] Because the Court of Appeals manifestly erred, I would grant leave to appeal.

I. Background

---

[2] I cannot recall any murder case that involved such egregious gamesmanship like submitting seven amended witness lists identifying as many as 141 witnesses but ultimately calling only 14 witnesses. The defense witness lists violated court orders intended to restrict these games. Defense counsel failed to furnish defense experts' reports, also contrary to court orders.

Defendant was convicted of first-degree felony murder for the death of her seven-year-old daughter Monique. The prosecution's proofs showed that defendant caused Monique to overdose on Imipramine, a medication prescribed for bedwetting and anxiety. In contrast, defense counsel presented two theories of the case. First, defense counsel argued that Monique herself took the pills either to commit suicide or from ignorance of the consequences. Second, defense counsel contended that the levels of Imipramine found in Monique's body were not fatal and that a heart defect caused her death. Defendant appealed her convictions. The Court of Appeals reversed, concluding that the trial court abused its discretion by excluding defense evidence concerning her limited intellectual functioning, by excluding Dr. Bernie Eisenga as an expert toxicologist, and by permitting the prosecution to elicit testimony about defendant's involvement with Child Protective Services without limiting the nature of such testimony.

Specifically, the Court of Appeals ruled that two defense experts were crucial and the exclusion of their testimony deprived defendant of a fair trial: a psychologist, Dr. Firoza VanHorn, and a toxicologist, Dr. Eisenga. The Court of Appeals failed, however, to consider the trial court's rulings regarding these experts in light of a series of discovery abuses by the defense. The trial court's rulings fell within the range of principled outcomes and in accordance with established caselaw, court rules, and statutes governing discovery because of defense counsel's serious and persistent discovery abuses. Any remaining errors were harmless.

## II. Analysis

### A. The Trial Court's Exclusion of Evidence Concerning Defendant's Limited Intellectual Functioning

The trial court excluded part of the testimony offered by defendant's daughter and the testimony of Dr. VanHorn concerning defendant's intellectual capacity. The prosecutor argued that, through this testimony, defendant improperly sought to establish "diminished capacity," a defense restricted by *People v Carpenter*, 464 Mich 223 (2001). In *Carpenter*, we explained that "the Legislature has signified its intent not to allow evidence of a defendant's lack of mental capacity short of legal insanity to avoid or reduce criminal responsibility by negating specific intent." *Id*. at 241. The Court of Appeals concluded that evidence regarding defendant's limited intellectual functioning was not "diminished capacity" evidence because it was not being offered to negate specific intent. Rather, the Court adopted the defense argument that it was offered to explain defendant's emotional responses and actions after Monique's death. The defense sought to introduce evidence of defendant's mental capabilities to refute the prosecution's charge that her emotional responses and other actions were signs of guilt. That is, the defense contended that defendant's limited mental capabilities, and not her guilt, made her respond in unusual ways. The prosecution has consistently asserted that this excluded evidence is diminished capacity evidence, however, and contends that

allowing such evidence would essentially create a "non-intent exception" to the prohibition on diminished capacity evidence set forth in *Carpenter*. In any event, the trial court's decision to exclude part of the testimony offered by defendant's daughter and the testimony of Dr. VanHorn fell within the range of principled outcomes.

### *1. Discovery Violations Involving Dr. VanHorn*

Although preliminary proceedings in this case began in 2000, nearly six years elapsed before jury selection began on February 22, 2006. Two years before trial, Dr. VanHorn, a psychologist and defense expert, administered tests to defendant at defense counsel's request. Defense counsel did not file a notice of intent to present an insanity defense or otherwise notify the prosecution about this witness. Personnel from the Center for Forensic Psychiatry thus never examined defendant in connection with any insanity or mental retardation claims.[3] Nor did any independent expert interview defendant in connection with defense counsel's purported theory about defendant's limited intellectual functioning. On February 4, 2005, defense counsel first listed Dr. VanHorn on his fifth amended witness list, calling her an "expert witness," without any further explanation. Counsel failed to file this witness list until after the court-ordered deadline had passed. Further, defense counsel never disclosed Dr. VanHorn's expert report, contrary to the court's order compelling production of reports by experts. Instead, defense counsel sprung Dr. VanHorn during trial on March 23, 2006, after the prosecution had already rested its case.[4]

---

[3] The Center for Forensic Psychiatry examined defendant twice but never in connection with defense claims of insanity or mental retardation. Defense counsel initially questioned defendant's competency during preliminary proceedings in 2000. On February 8, 2000, personnel at the Center for Forensic Psychiatry examined defendant and found her competent to stand trial. Years later, after a remand from this Court in April 2003, I note that Judge William J. Caprathe repeatedly attempted to schedule the trial. On September 16, 2005, less than one month before an October 11, 2005, trial date, counsel asserted that defendant was incompetent to assist in her defense. On September 27, 2005, she was sent to the Center for Forensic Psychiatry and subsequently found competent to stand trial.

[4] In his concurring statement, Justice Markman notes that at a hearing on February 21, 2006, the prosecutor did not object to Dr. VanHorn's testimony. *Ante* at p 2. His observation, however, yields an incomplete picture of the record with regard to issue preservation. Defense counsel still failed to provide actual notice of Dr. VanHorn's testimony. The prosecutor maintained his objection to that failure. First, defense counsel admitted that Dr. VanHorn was one of several witnesses "disclosed to the prosecutor by a formal written list of witnesses about two weeks after the cutoff that this Court imposed" in violation of a court order. The prosecutor, during the same February 21, 2006, hearing, reiterated his concern regarding defense counsel's discovery violations, stating,

Although counsel named Dr. VanHorn on defendant's fifth amended witness list, he buried Dr. VanHorn's name among 140 other defense witnesses. Indeed, defense counsel filed seven amended witness lists before trial and buried various experts in all these lists. His sixth and seventh amended witness lists each contained 101 potential defense witnesses. The last two witness lists, however, omitted any mention of Dr. VanHorn.[5]

Nonetheless, the court permitted the defense to call Dr. VanHorn to testify in a limited fashion so that defense counsel had an opportunity to make a special record. Significantly, the prosecution filed a motion in limine to bar the defense of diminished capacity on March 21, 2006, and the trial court granted this motion on March 23, 2006. The court expressed concern that this defense strategy was a back door attempt to assert a mental retardation defense under the guise of "limited emotional reactions" stemming from defendant's alleged limited intellectual ability. The trial court also was concerned that the prosecution had no opportunity to test defendant regarding her psychological make-up. Moreover, at the time defense counsel called Dr. VanHorn, he had not yet supplied the prosecutor with any information whatsoever concerning reports prepared or tests conducted by Dr. VanHorn with respect to defendant's mental limitations. The only information that defense counsel had given the prosecutor regarding Dr. VanHorn's proposed testimony indicated that Dr. VanHorn would testify about defendant's diminished capacity, which, as noted, is a defense restricted by *Carpenter*, *supra*. Under these circumstances, the trial court attempted to limit defense counsel's ambush.[6]

---

"And I just want to place that on the record that, you know, if defense counsel is calling expert witnesses, that if these witnesses have reports that he needs to comply with what this Court has ordered previously by way of its orders." Moreover, when defense counsel called Dr. VanHorn to testify on March 23, 2006, he failed to provide the prosecutor with any information whatsoever concerning expert reports prepared by her, again in violation of the court order to do so. Therefore, while the prosecutor did not object to Dr. VanHorn's testimony on February 21, 2006, the prosecutor consistently objected to defendant's ongoing discovery violations. In addition, the prosecutor specifically objected to Dr. VanHorn's testimony on March 23, 2006, because defense counsel only informed the prosecutor that Dr. VanHorn would testify about defendant's diminished capacity, a defense explicitly precluded by an earlier ruling.

[5] According to the docket sheet, defense counsel filed his sixth amended witness list on February 15, 2006. He filed his seventh amended witness list two days later on February 17, 2006. Defense counsel filed his fifth amended witness list approximately one year earlier, on February 1, 2005.

[6] Justice Markman also argues that any "relatively minor evidentiary violation" committed by defense counsel does not justify "the extreme remedy of exclusion" regarding Dr. VanHorn's testimony. *Ante* at fn 1, p 2. I respectfully disagree that the

Because the trial court could have properly precluded Dr. VanHorn from testifying at all,[7] its rulings regarding the scope of her testimony were harmless error.[8]

## 2. *Testimony of Defendant's Daughter Roxanne Davis*

The trial court excluded a portion of the testimony given by defendant's daughter Roxanne regarding defendant's intellectual capacity to plan the crime and defendant's communication skills. The trial court expressed concern that such testimony represented impermissible diminished capacity evidence. In contrast, the Court of Appeals adopted the defense argument that Roxanne could "properly testify about defendant's poor communication skills and how defendant's behaviors might seem unusual because of her 'slowness' without running afoul of the rule stated in *Carpenter*." *Yost*, *supra* at 359. Even if the Court of Appeals is correct, however, defense counsel ultimately elicited testimony from Roxanne about her mother's limited intellectual functioning even though the trial court's ruling barred such testimony. Therefore, even assuming that Roxanne's testimony should have been admitted, the error was harmless.

Responding to a question from defense counsel, Roxanne stated, "My father doesn't have the mental limitations that she [defendant] did, so there was more reading

---

egregious actions of defense counsel, including repeatedly violating court orders, can be described as "relatively minor." *Ante* at pp 6-7.

[7] I do not believe that Dr. Van Horn's testimony was proper, but that question need not be resolved because Judge Caprathe could have barred her testimony outright. Dr. VanHorn's testimony about defendant's limited mental capabilities was inadmissible under MRE 702 because "MRE 702 requires the trial court to ensure that each aspect of an expert witness's proffered testimony—including the data underlying the expert's theories and the methodology by which the expert draws conclusions from the data— is reliable." *Gilbert v Daimler Chrysler Corp*, 470 Mich 749, 779 (2004). Defense counsel provided no data underlying Dr. VanHorn's theories. Nor did he provide information regarding the methodology by which Dr. VanHorn drew her conclusions. Moreover, defense counsel did not fulfill the evidentiary requirement of MRE 703 that "[t]he facts or data in the particular case upon which an expert bases his opinion or inference shall be in evidence." Because all of defendant's statements to Dr. VanHorn constituted inadmissible hearsay, the trial court properly excluded her testimony. See Staff Comment to 2003 Amendment of MRE 703 ("The modification of MRE 703 corrects a common misreading of the rule by allowing an expert's opinion only if that opinion is based exclusively on evidence that has been introduced into evidence in some way other than through the expert's hearsay testimony.")

[8] The Court of Appeals *speculated* that Dr. VanHorn's testimony *might not* have been hearsay, but its speculation was not based on anything in an actual offer of proof. *Yost*, *supra* at 362-364.

and intellectual conversations." Defense counsel later asked Roxanne, "How were your mother's communication skills?" but the prosecutor objected. On appeal, the Court of Appeals reasoned that "the relevance of any testimony by Roxanne concerning whether her mother was intelligent enough to carry out the actions necessary to commit the crime was at best marginal." *Yost, supra* at 359. Nevertheless, the jury heard testimony from her concerning her mother's intelligence and mental limitations.

In addition to Roxanne testifying about her mother's limited intellectual functioning, other witnesses offered similar testimony in the jury's presence. In one such instance, defense counsel asked a social worker, Amy Martinez, whether defendant had difficulty filling out necessary forms, asking Martinez, "You said she would ask you to help her with filling out forms?" After Martinez asked defense counsel a question to clarify whether he meant her forms, defense counsel again asked, "Yes. Did she have difficulty filling out your forms?" Moreover, although counsel's statements are not evidence, defense counsel invoked defendant's mental limitations at least 11 times in his opening and closing arguments to the jury. Because witnesses other than Roxanne testified regarding defendant's limited intellectual capacity and the jury heard repeated statements concerning defendant's mental limitations in defense counsel's opening and closing arguments, any error made by the trial court in excluding this portion of Roxanne's testimony was harmless.

## B. The Trial Court's Exclusion of Dr. Bernie Eisenga as an Expert Toxicologist and Limiting the Scope of Dr. Steven Cohle's Testimony as an Expert Pathologist

### 1. Discovery Violations Involving Dr. Eisenga and Dr. Cohle

Defense counsel also engaged in discovery abuses with regard to Dr. Eisenga and Dr. Cohle. Before trial, the prosecutor filed two separate motions to compel discovery.[9] At the hearing on the prosecutor's second motion to compel discovery, the prosecutor advised the court that he had not received amended witness lists that defense counsel claimed to have furnished. Moreover, the prosecutor challenged the propriety of defense counsel's amended witness list, which contained entries such as, "all persons named or otherwise identified in the police reports related to this case" and "all persons named or otherwise identified in the FIA-DDS records and reports related to the agency's contact with Donna Yost or her family members." Defense counsel responded that he "threw those in, in case we—we need anyone during trial." At this same hearing, defense counsel advised the trial court that Dr. Laurence Simson, the defense's expert witness concerning forensic pathology, had moved to Arizona and that defense counsel was in the process of finding a substitute expert.

---

[9] The prosecutor filed its first motion to compel discovery on July 23, 2004. Several months later, the prosecutor filed its second motion to compel discovery on November 12, 2004.

Even though the court had already set the case for trial approximately one month later on February 16, 2005, the trial court instead held hearings on that day regarding, in relevant part, defense counsel's filing of two additional amended witness lists containing at least 12 more witnesses and five more doctors. He filed both lists several days after the trial court's filing deadline had passed. The prosecutor objected because he had no idea who those five new doctors were or for what purpose the defense intended to call them. In an attempt to prevent further ambushes regarding the defense's evolving witness lists, the trial court held that before either side would be permitted to add any more witnesses, that side first must file a motion and obtain court approval at least 30 days before the trial. Defense counsel agreed that permitting additions to the witness lists only by motion was "appropriate." He further suggested, "How about if I submit a finalized witness list by Friday that eliminates those that you've ordered to be stricken and eliminates those doctors that I've indicated to Mr. Sheeran should be omitted. And we'll make Friday's list, the official list? Is that agreeable?" The prosecutor agreed with counsel's suggestion, and the trial court noted the agreement on its "Action in Court" document for February 16, 2005.

Over one year later, the day before trial was scheduled to begin on February 21, 2006, defense counsel moved to add a new expert pathologist and a new expert toxicologist. Counsel requested to have Dr. Cohle replace Dr. Simson as the defense expert pathologist. Like Dr. VanHorn, Dr. Cohle appeared on defendant's fifth amended witness list identified only as "expert witness," but counsel failed to include him on defendant's seventh and final witness list. Additionally, he sought to present Dr. Cohle, in direct violation of the trial court's previous order that all new witnesses be admitted only by formal motion at least 30 days before trial. Nevertheless, the trial court permitted Dr. Cohle to testify on defendant's behalf.

On February 21, 2006, defense counsel sought to add Dr. Eisenga as a new expert toxicologist. Dr. Eisenga did appear on defendant's seventh amended witness list. But defense counsel failed to file a formal motion to present Dr. Eisenga as a witness until the day before trial, again in violation of the court's order. Defense counsel explained that he neglected to follow the order regarding the addition of new witnesses because "it completely slipped my mind." The prosecutor objected to defense counsel's "very very late amendment" of Dr. Eisenga as an expert and requested that if the court allowed Dr. Eisenga to testify, defense counsel must at the very least comply with MCR 6.201(A)(3), which addresses expert witnesses and requires a party to provide all other parties with additional information about an expert witness and the basis for the witness's opinion. The prosecutor also noted, "I have requested, by way of discovery, reports from any experts. I've never received any reports from any of his experts." Defense counsel responded, "We have no written reports from any of these experts to provide to the prosecutor and that's why we haven't provided any." The trial court ordered that both parties comply with MCR 6.201 with respect to experts named by either side. It also

declined to allow defense counsel to add Dr. Eisenga on the day before trial, in flat violation of the court's discovery order. This was a principled decision, in light of counsel's noncompliance with court orders.

Moreover, any error by the trial court in refusing defendant's request to add Dr. Eisenga as a witness was harmless because other witnesses testified regarding the same proofs that Dr. Eisenga would have addressed. Defense counsel wished to have Dr. Eisenga testify regarding (1) postmortem redistribution, (2) the standards and practices in obtaining samples to give accurate levels of Imipramine, and (3) the amount of Imipramine necessary to cause death. Both Dr. Cohle and Dr. Fleisher testified extensively on the same subject matter. Dr. Cohle testified about postmortem toxicology, including postmortem redistribution. Dr. Fleisher's recorded testimony also addressed the postmortem redistribution that would have occurred when blood was taken from Monique's heart approximately 20 hours after her death. Additionally, Dr. Cohle testified that the heart was a poor source of blood when conducting postmortem toxicology, and, as a result, the Imipramine level in Monique's blood likely was lower than the prosecutor's pathologist concluded. Similarly, Dr. Fleisher testified that approximately 10 percent of the Caucasian population does not metabolize Imipramine well and poor metabolization would cause elevated levels of the drug. Finally, Dr. Cohle testified that based on his 24 years of experience as a forensic pathologist, he would not have ruled this as a homicide. Therefore, even if the trial court erred by not permitting Dr. Eisenga to testify, its error was harmless because both Dr. Cohle and Dr. Fleisher testified regarding the same proofs.

### 2. Limitations Placed on the Scope of Dr. Cohle's Testimony

The Court of Appeals also erred when it concluded sua sponte that the trial court committed plain error regarding the limitations placed on the testimony of defendant's expert pathologist, Dr. Cohle. The Court of Appeals concluded that the trial court prevented Dr. Cohle from testifying about "the accuracy of the level of Imipramine in Monique's blood, the accuracy of the calculation of the number of pills it would take to reach that level, and whether the Imipramine in Monique's blood was sufficient to cause her death" because the data upon which the opinion relied was inadmissible hearsay. This is not accurate. The trial court did note that the testimony was inadmissible hearsay, but the basis for the prosecutor's objection was the lack of reliable testimony or evidentiary support for Dr. Cohle's conclusions. The prosecution moved to exclude the testimony because Dr. Cohle had no support for his opinions relating to children. All Dr. Cohle's data involved adults, and he admitted that he had no authority pertaining to pediatric deaths from Imipramine. In fact, he did not know whether the age of a person would be a factor. He testified:

> I have not seen anything in the literature that would say, you know, a certain drug is more dangerous for a younger person, particularly.

> Although, there are certainly often differences in children, you know, and adults, and it's possible that a drug that is not toxic at a certain level in an adult, might be toxic to a younger person.

Therefore, the prosecutor reasonably argued that Dr. Cohle's testimony was insufficiently reliable, contrary to the requirement of MRE 702. Accordingly, the trial court acted within its discretion when limiting Dr. Cohle's testimony on this point.

### C. The Trial Court Did Not Abuse its Discretion by Ruling that Defendant's Prior Acts of Physical Abuse Towards her Children were more Probative than Prejudicial

Next, defendant sought to exclude evidence of her extensive history with Protective Services, including evidence of physical abuse, three prior incidents of drug overdoses involving her children, and allegations of sexual abuse. Because the trial court is in the best position to judge the prejudicial effect or evidentiary value of a given piece of evidence, "a defendant must meet a high burden to show that a trial court abused its discretion by declining to exclude relevant evidence under MRE 403." *People v Albers*, 258 Mich App 578, 588-589 (2003).

The Court of Appeals concluded that defendant's history with Protective Services was strong evidence of defendant's motive, but concluded that its prejudicial nature substantially outweighed its probative value. In contrast, it determined that evidence of the three prior drug overdoses involving defendant's children was relevant and not unfairly prejudicial. It further held that evidence of sexual abuse was relevant and that the probative value of this evidence outweighed its prejudicial nature.

The Court of Appeals only disagreed with the trial court's ruling pertaining to testimony about specific instances of defendant physically abusing her children. The trial court, after a hearing, concluded that all the prior acts were highly relevant and none of the evidence of prior acts was unfairly prejudicial. In contrast, the Court of Appeals concluded that the trial court abused its discretion by allowing such prior acts evidence. In any event, the trial court allowed the prosecutor to present proofs that defendant characterized Monique as a liar for reporting defendant to Protective Services for specific acts of physical abuse in various statements to the police. As this evidence came in through defendant's own statements, I question the Court of Appeals conclusion that the trial court abused its discretion by permitting evidence of prior acts of physical abuse. In concluding otherwise, the Court of Appeals simply substituted its opinion for that of the trial court. Again, the trial court acted within the range of principled outcomes when it admitted the prior acts evidence.

### D. The Trial Court Did Not Abuse its Discretion in Light of the Defense's Persistent Violation of CaseLaw, Court Rules, and Statutes Regarding Discovery

As illustrated by the above examples, defense counsel's actions displayed a degree of gamesmanship that violated well-established caselaw, court rules, and statutes governing discovery. "We have long entrusted the question of discovery in criminal cases to the discretion of the trial court." *People v Lemcool* (*After Remand*), 445 Mich 491, 497 (1994). Moreover, "Michigan recognizes the broad power of the trial court to prevent ambush and surprise through the use of discovery." *Id*. at 498 (quotation marks and citation omitted). In 1995, this Court adopted Subchapter 6.200 of the Michigan Court Rules, which provides a series of standards for discovery. Pursuant to MCR 6.201(A)(1), upon request, a party must provide all other parties with "the names and addresses of all lay and expert witnesses whom the party may call at trial." Additionally, as noted, upon request, a party must provide all other parties with "the curriculum vitae of an expert the party may call at trial and either a report by the expert or a written description of the substance of the proposed testimony of the expert, the expert's opinion, and the underlying basis of that opinion." MCR 6.201(A)(3).

After reviewing the voluminous record, I conclude that defense counsel violated MCR 6.201(A)(3). He failed to provide the curriculum vitae of many of his experts. And, as the prosecutor advised the trial court, counsel also failed to provide reports by the experts or written descriptions of the substance of their testimony. Faced with defendant's evolving witness lists, the trial court tried to prevent ambush trial tactics by ordering that either party attempting to add a new witness after February 16, 2005, must do so by a formal motion filed at least 30 days before trial. The trial began over one year later on February 22, 2006, yet defense counsel waited until February 21, 2006, to formally move to add his new expert toxicologist. Counsel attempted to justify his violation of the order by explaining that "[a]gain, though, I had forgotten that you required us to file a motion to seek permission to add anyone and that's why I'm doing it at this late date." Counsel also pleaded ignorance of MCR 6.201(A)(3), insisted that he had no reports, and failed to produce even written descriptions of the proffered testimony to give the prosecution, as the rule requires.

Defense counsel similarly violated well-established statutory requirements regarding the introduction of expert testimony. MCL 767.94a(1)(b) requires that a defendant disclose the nature of any defense that she intends to establish at trial by expert testimony. MCL 767.94a(2) requires that the disclosure must occur no later than 10 days before trial or at any other time as the court directs. A defendant may not "offer at trial any evidence required to be disclosed . . . unless permitted by the court upon motion for good cause shown." MCL 767.94a(3). In this case, defense counsel continually ignored these statutory requirements.

III. Conclusion

In light of defense counsel's repeated discovery violations, I think that the Court of Appeals erred by ruling that the trial court abused its discretion or committed an error requiring reversal. Specifically, the trial court did not abuse its discretion when it opined that if defendant wished to offer expert testimony from Dr. VanHorn regarding defendant's mental limitations and psychological make-up, then the prosecutor was entitled to counter with expert evidence of her psychological make-up. In any event, defense counsel repeatedly injected statements or elicited testimony concerning defendant's mental limitations in the jury's presence. Nor is it clear how the trial court abused its discretion by refusing to allow defense counsel to add Dr. Eisenga as a witness the day before the trial, in direct violation of the court's order. I do not see how the trial court's decisions fell outside the range of principled outcomes, particularly in light of defense counsel's gamesmanship.

"The decision whether to admit evidence is within a trial court's discretion. This Court reverses it only where there has been an abuse of discretion." *People v Katt,* 468 Mich 272, 278 (2003). When the trial court heard arguments regarding the prosecutor's motion in limine to bar the defense of diminished capacity, the prosecutor had already presented the entire case in chief. At that late stage of the trial, the trial court correctly assessed the impropriety of allowing defense counsel to provide lengthy testimony regarding defendant's psychological make-up without giving the trial court and the prosecutor adequate notice.

Moreover, as the United States Supreme Court has stated:

> Rules that provide for pretrial discovery of an opponent's witnesses serve the same high purpose [as rules enforcing the right to cross-examine]. Discovery, like cross-examination, minimizes the risk that a judgment will be predicated on incomplete, misleading, or even deliberately fabricated testimony. The "State's interest in protecting itself against an eleventh hour defense" is merely one component of the broader public interest in full and truthful disclosure of critical facts. [*Taylor v Illinois*, 484 US 400, 411-412 (1988).]

Here, defense counsel buried various experts in seven amended witness lists. Experts such as Dr. VanHorn and Dr. Cohle appeared on one list, only to be omitted from later

lists. Defense counsel did not disclose his purpose for listing these experts, as required by court rules governing discovery. Nor did he furnish experts' reports, contrary to court order. The trial court had an interest in both protecting the prosecution from a defense ambush and facilitating the full and truthful disclosure of critical facts. *Id*. I believe that the trial court attempted to facilitate full disclosure as best it could despite the fact that defense counsel kept playing "hide the ball."

Therefore, the Court of Appeals manifestly erred by ignoring defense counsel's repeated discovery violations and by holding that the trial court abused its discretion in its attempts to prevent ambush trial tactics. In my view, the trial court did not abuse its discretion. Because the trial court reached the right result regarding its evidentiary rulings even if it arguably employed the wrong reasons at times, I would grant leave to appeal.

HATHAWAY, J., not participating. To avoid unnecessary delay to the parties in cases considered by this Court before I assumed office, I follow the practice of previous justices in transition and participate only in cases that need my vote to achieve a majority for a decision.



I, Corbin R. Davis, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

January 16, 2009

_____
Clerk

d0113