*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

MELISSA SUE MORGAN,

        Defendant-Appellant.

UNPUBLISHED
March 10, 2022

No. 353557
Kalamazoo Circuit Court
LC No. 2019-001017-FC

Before: M. J. KELLY, P.J., and STEPHENS and REDFORD, JJ.

PER CURIAM.

Defendant, Melissa Morgan, appeals as of right her convictions of first-degree arson, MCL 750.72; and felony murder, MCL 750.316(1)(b). Because there are no errors warranting reversal, we affirm.

## I. BASIC FACTS

Zachariah Hayes died after his house was intentionally set on fire. Before the fire, Morgan stayed at Hayes's home in Kalamazoo on a regular basis and kept many of her possessions there. Witnesses testified that Hayes cared deeply for Morgan, but she did not appear to feel the same about him. Morgan had been staying at Hayes's house since February 1, 2019, because her then-boyfriend, David Wise, had beaten her.

Around midnight on February 3, 2019, Morgan sent her friend Justin Flegel a text message stating that Hayes had raped her. Flegel was homeless and lived in a nearby encampment. He had met Hayes through Morgan, but had been banned from Hayes's house because, contrary to Hayes's wishes, he had been talking with Morgan in her bedroom. Flegel told Morgan that he was on his way and to get ready to leave the house. When he arrived at Hayes's house, Morgan told him that Hayes was passed out in his bedroom.

Flegel had been at the house for about 15 minutes when Trevor Kuhnle, one of Hayes's neighbors, arrived. Kuhnle asked about Hayes and was told that he was in the back bedroom, passed out. Morgan then told Kuhnle that Hayes had raped her three times. Morgan was upset and crying, and Kuhnle and Flegel tried to convince her to call the police, but she refused, saying

that warrants were out for her arrest and she did not want to deal with them. Morgan, Flegel, and Kuhnle went outside and stood by Kuhnle's van, smoking cigarettes. Morgan was pacing back and forth, cursing, and trying to find a ride. After 15 or 20 minutes, Kuhnle went back inside his house.

Morgan and Flegel returned to Hayes's house. Flegel kept telling Morgan that she could not stay there, and Morgan was "freaking out," "really angry," and upset. Flegel left the house to go back to his campsite. He testified that he returned after a few minutes and saw "some stuff on fire" and Morgan "lighting other stuff on fire." He asked Morgan if she was trying to kill Hayes and told her that she needed to stop, but she said that Hayes was already dead. They left and went to a house on a nearby road. Morgan went inside the house, and Flegel returned to his campsite.

One of the occupants of that house, Bobby Shears, testified that he was awakened by Morgan, who was sitting on the floor, screaming into her phone, using a lot of foul language, and giving directions to the house. He heard her say, "[O]h fuck I'm in so much fucking trouble" and "I'm the reason someone is dead." Thereafter, Wise arrived with several others and took Morgan to a house in Lawrence. Ira Clough, one of the men who accompanied Wise to get Morgan, testified that Morgan was crying and scared, and Morgan and Wise told him that she had been raped. Clough also testified that, while driving back to Lawrence, he heard something that could have been a phone being thrown out of the window. When Morgan arrived at the Lawrence house, she borrowed some clothes and took a shower; the clothes she had been wearing were burned in the backyard.

The fire at Hayes's house was discovered when Kuhnle went to retrieve some food from his van. He testified that he looked down the street in the direction of Hayes's house and saw what looked like a "bomb fire." Once he realized that Hayes's house was on fire, he called 911 as he was running toward Hayes's house. By the time he got there, the back of Hayes's house was engulfed in flames. The medical examiner testified that Hayes's body had thermal injuries over 85% of his body and that his cause of death was a combination of "inhalation of products of combustion and thermal injuries." The fire marshal opined that the fire started in the living room, that it was started by human involvement, and that it was intentionally set.

The police questioned Flegel at his encampment later in the morning on February 3. Initially, he told them that he was not at Hayes's house. Eventually, he admitted to seeing a fire, but he said that he did not see how it started. Then, on February 14, during his last interview with police, he told them that Morgan set the fire.

Although multiple agencies across multiple counties searched for Morgan, and her photograph was released to the media, she eluded police for five days. Then, on February 8, she went to meet with Flegel at a restaurant and was arrested. Thereafter, she was questioned by the police on three separate occasions. She was then charged with first-degree arson and felony murder. Following a jury trial, she was convicted of both charges. This appeal follows.

## II. EXPERT OPINION

### A. STANDARD OF REVIEW

Morgan argues that the trial court violated her right to a fair trial when it qualified Kalamazoo Department of Public Safety (KDPS) Officer Steven Seiser as an expert and allowed him to testify about the patterns and behaviors of drug-dependent people. We review for an abuse of discretion a trial court's decision to qualify a witness as an expert and to admit that expert's testimony. *People v Bynum*, 496 Mich 610, 623; 852 NW2d 570 (2014). "A trial court abuses its discretion when its decision falls outside the range of principled outcomes." *People v Feezel*, 486 Mich 184, 192; 783 NW2d 67 (2010) (quotation marks and citation omitted).

### B. ANALYSIS

MRE 702 provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"A court considering whether to admit expert testimony under MRE 702 acts as a gatekeeper and has a fundamental duty to ensure that the proffered expert testimony is both relevant and reliable." *People v Kowalski*, 492 Mich 106, 120; 821 NW2d 14 (2012) (MARY BETH KELLY, J., joined by YOUNG, C.J., and ZAHRA, J.). The inquiry regarding relevance and reliability is a flexible one "[b]ecause there are many different kinds of experts and expertise." *Id*. Police officers often fall into the category of persons with "specialized knowledge" derived from their training or experience. See, e.g., *People v Dixon-Bey*, 321 Mich App 490, 499-500; 909 NW2d 458 (2017) (indicating that a police officer qualified by knowledge, skill, experience, training, and education may testify as an expert on the subject of homicides); and *People v Dobek*, 274 Mich App 58, 77, 79; 732 NW2d 546 (2007) (stating that a police officer's background and experience in investigating child sex abuse cases more than qualified him to testify about delayed disclosure).

Officer Seiser testified at a hearing on Morgan's motion to preclude his testimony that he had been a police officer for 19 years. For the last seven years, he had been an investigator with the KVET, where he came into contact with five to eight drug users each day. Some of his contacts became confidential informants, and he tried to establish a relationship of trust with them and to get to know their lifestyle, where they came from, and what their daily activities were. Through his work, he became familiar with their patterns of behavior—when they sleep, when they are awake, where they like to hang-out—and where different types of substance-abuse communities are located.

-3-

Morgan argues that the testimony was unreliable because it lacked scientific indicia of reliability. However, when determining the admissibility of expert testimony, a court "may consider reliability factors pertinent to the particular type of expert testimony offered and its connection to the particular facts of the case." *Kowalski*, 492 Mich at 120. Here, the type of expert testimony offered derived from hands-on, on-the-scene learning through interaction with, and observation of, the day-to-day lives of certain people in Kalamazoo County. Thus, the officer did not posit a theory that could be subject to scientific scrutiny; he offered a profile based on his knowledge and experience. The factors pertinent to the reliability of his testimony were his years-long experience with the KVET team and his daily contact with multiple drug users. Given the nature and purpose of the officer's testimony, the trial court did not abuse its discretion by deeming the officer's experience a more pertinent reliability factor than those reliability factors typically associated with scientific and technical expert testimony.

Morgan also contends that Officer Seiser's testimony was unreliable because it was derived from confidential informants who may have been providing information for pay or to work off charges. However, the testimony was based on his observations and the observations of his KVET colleagues, not simply on information provided by confidential informants. Moreover, the reliability of the testimony was essentially confirmed by the testimony of defense witness Holly Rosen, who, like Officer Seiser, testified that vulnerable and drug-dependent people often rely on others in the same condition that they are in, and can develop quid pro quo relationships, including the exchange of sex for drugs or basic resources. Additionally, like Officer Seiser, Rosen testified that there is often "manipulation where there is drug dependency," and she agreed that addicts do it to get what they need to satisfy their habit.

In sum, the basis for Officer Seiser's testimony was the experience-based knowledge that he gained during the seven years he has been assigned as an investigator to the KVET unit. In light of his experience working with drug users as a member of KVET, and considering the nature of his testimony, the trial court's qualification of Officer Seiser as an expert in the patterns of behavior of methamphetamine users does not fall outside the range of principled outcomes. Further, the fact that Officer Seiser had not formally studied the lifestyles of homeless drug users or formally documented his own observations pertained to the weight of his testimony, not to its admissibility. It is well-established that the weight to give testimony is for the trier of fact to decide. *People v Goodrode*, 132 Mich 542, 548; 94 NW 14 (1903). Accordingly, the trial court did not abuse its discretion when it qualified Officer Seiser as an expert in the patterns and behaviors of drug users.

## III.  SELF-INCRIMINATION

## A.  STANDARD OF REVIEW

Morgan next argues that her request for a scrap of paper from her backpack with a phone number and the name "Travis" on it was tantamount to asking for a lawyer, and she argues that the failure of Detectives Jon Stolsonburg and Gary Guadard to give her the requested information constituted a violation of her constitutional rights. We review a trial court's factual findings in a ruling on a motion to suppress for clear error, but review de novo whether the trial court applied the correct constitutional standard. *People v Elliott*, 494 Mich 292, 300-301; 833 NW2d 284 (2013).

B. ANALYSIS

The United States Constitution and the Michigan Constitution guarantee that no person will be compelled to be a witness against himself or herself. US Const, Am V; Const 1963, art 1, § 17. To protect this privilege against self-incrimination, custodial interrogations must be proceeded by advising the suspect that he or she "has the right to remain silent, that any statement he makes may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed." *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966). In *Edwards v Arizona*, 451 US 477, 484-485; 101 S Ct 1880; 68 L Ed 2d 378 (1981), the United States Supreme Court held that when a suspect invokes his or her right under *Miranda* to speak with a lawyer before a custodial interrogation, the suspect "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." The purpose of the *Edwards* rule is "to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan v Harvey*, 494 US 344, 350; 110 S Ct 1176; 108 L Ed 2d 293 (1990). The *Edwards* rule does not apply unless a suspect unambiguously asserts his or her right to a lawyer. *Davis v United States*, 512 US 452, 459; 114 S Ct 2350, 2355; 129 L Ed 2d 362 (1994); *People v Granderson*, 212 Mich App 673, 677-678; 538 NW2d 471 (1995).

Before trial, Morgan moved to suppress statements she made during the February 14 interview with Stolsonburg and Guadard. According to the motion, Morgan was brought from her jail cell to an interview room so that Detective Sgt. Michael DeNoon could administer a polygraph examination. When the detective sergeant told Morgan that she was in the room for a polygraph, she said, "Yeah but I haven't gotten to speak to a lawyer or anything." She then asked for a phone number that was on a slip of paper in her backpack. DeNoon exited the room to speak with Stolsonburg and Guadard. Upon his return, he told Morgan that it sounded like she "would be more comfortable talking to a lawyer, or at least thinking about it more." He then asked her if he could check with her in a week to see if she would like to take the polygraph. He also asked if she was willing to talk to Stolsonburg and Guadard. Morgan answered both questions affirmatively. Thereafter, Stolsonburg and Guadard then entered the room and began talking to Morgan about the polygraph. They advised her of her rights under *Miranda*, and she agreed to answer their questions. At the motion to suppress, Stolsonburg testified that all three detectives interpreted the request for a lawyer to pertain strictly to the polygraph. He also stated that they searched Morgan's backpack for a slip of paper with the name "Travis" on it, but found nothing that matched her description.

The trial court found that Morgan's statement regarding a lawyer was ambiguous. We agree. Regardless of whether she said, "maybe after I talk to an attorney," or "I haven't even talked to a lawyer yet," neither statement was a request for a lawyer. See *Davis*, 512 US at 462. Morgan's statement was also ambiguous because, given the context in which it was made, it was not clear whether she wanted to talk to a lawyer about the polygraph examination or whether she wished to foreclose all further discussion with law enforcement until she had spoken to a lawyer. Accordingly, it was entirely reasonable for DeNoon to attempt to clarify Morgan's intent. See *id.* at 461 (noting that "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney"). Further, Morgan acknowledged that she answered affirmatively when asked if she would be willing to talk to Stolsonburg and Guadard. Thereafter, they advised her of her rights

under *Miranda* and that she agreed to answer their questions. Finally, Morgan's request for a scrap of paper with a phone number on it, without more, was not a clear and unambiguous request for a lawyer.

For the foregoing reasons, the trial court did not err by denying Morgan's motion to suppress statements made during her February 14 interview.

## IV. HEARSAY

Morgan also contends that Wise's statement—"I think she might have killed him. She said the house was on fire and we picked her up somewhere else down the road"—was inadmissible hearsay. " 'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Hearsay is generally inadmissible. MRE 802. However, "[o]therwise objectionable hearsay testimony may be admissible if it amounts to an excited utterance." *People v Gee*, 406 Mich 282; 278 NW2d 304 (1979).

An "excited utterance" is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or the condition." MRE 803(2). The statement "must arise out of a startling occasion," "must be made before there has been time to contrive and misrepresent," and "must relate to the circumstances of the startling occasion." *Gee*, 406 Mich at 282. The relevant inquiry is "whether the statement was made when the witness was still under the influence of an overwhelming emotional condition." *People v Straight*, 430 Mich 418, 424; 424 NW2d 257 (1988). "[I]t is the lack of capacity to fabricate, not the lack of time to fabricate, that is the focus of the excited utterance rule. The question is not strictly one of time, but of the possibility for conscious reflection." *People v Smith*, 456 Mich 543, 551; 581 NW2d 654 (1998).

Wise's statement indicates that it was the product of conscious thought. "I think she might have killed him" is a hypothetical conclusion drawn from Morgan's statement that Hayes's house was on fire and the fact that Wise and his companions picked up Morgan "somewhere else down the road." Thus, although Wise may have been under the stress of excitement caused by everything he experienced the night of the fire, the fact that he connected Morgan's rape allegations to the fire at Hayes's house suggests that he was not so overcome that he could not consider the facts available to him, speculate about their meaning, and arrive at a conclusion. Because it was the product of conscious thought, Wise's statement lacked indicia of reliability typically required for otherwise inadmissible hearsay to be admitted as an excited utterance. See *id*. at 551, 553. Accordingly, the trial court abused its discretion by admitting Wise's hearsay statement.

However, the erroneous admission of a hearsay statement does not require reversal unless the error affected the defendant's substantial rights, see MRE 103(a), or the refusal to act would be inconsistent with substantial justice, MCR 2.613(A). Whether erroneously admitted evidence requires reversal depends on the nature of the error and its effect in light of the weight of the properly admitted evidence. *People v Phillips*, 469 Mich 390, 397; 666 NW2d 657 (2003). In this case, the nature of the error was the admission of a hypothetical. Morgan contends that she was significantly prejudiced because Wise's statement was consistent with Flegel's testimony, and the prosecutor used it during her closing argument to bolster Flegel's credibility. However, based on

our review of the record it does not appear that the prosecutor actually used the statement. In addition, to the extent that Wise's hypothetical was meant to imply that he thought Morgan killed Hayes, the jury heard testimony from Shears that he heard Morgan say, "[O]h fuck I'm in so much fucking trouble" and "I'm the reason someone is dead." Given the strength of the other evidence from which the jury could have inferred Morgan's guilt, there is no reasonable basis to believe that Wise's speculative opinion was outcome-determinative.

## V. DESTRUCTION OR LOSS OF EVIDENCE

### A. STANDARD OF REVIEW

Next, Morgan contends that her right to present a defense was violated by the prosecution's loss of potentially exculpatory evidence and that her trial lawyer rendered ineffective assistance by failing to request a hearing to determine whether the police and the prosecution acted in bad faith and by failing to request an adverse inference instruction. Because defendant did not raise this issue in the trial court, the issue is unpreserved. See *People v Bosca*, 310 Mich App 1, 47; 871 NW2d 307 (2015). This Court reviews unpreserved claims of constitutional error for plain error affecting the defendant's substantial rights. *Id*.

### B. ANALYSIS

"Defendants have a due process right to obtain evidence in the possession of the prosecutor if it is favorable to the accused and material to guilt or punishment." *People v Stanaway*, 446 Mich 643, 666; 521 NW2d 557 (1994). However, "[n]either the prosecution nor the defense has an affirmative duty to search for evidence to aid the other's case." *People v Burwick*, 450 Mich 281, 289 n 10; 537 NW2d 813 (1995). "[D]ue process does not generally require the prosecution to seek and find exculpatory evidence or to search for evidence that will support a defendant's case[.]" *People v Dimambro*, 318 Mich App 204, 213; 897 NW2d 233 (2016). Here, the gravamen of Morgan's argument is that the police acted in bad faith by failing to order the collection of a DNA sample from Hayes's genitals. See *Arizona v Youngblood*, 488 US 51, 58; 109 S Ct 333; 102 L Ed 2d 281 (1988) (holding that the failure of police to preserve potentially exculpatory evidence did not constitute a denial of due process absent the defendant's showing of bad faith.)

Morgan offers no substantive evidence in support of her assertion of bad faith. By contrast, Stolsonburg explained that obtaining a DNA sample from Hayes's genitals would have been inconsistent with departmental policy. He testified that obtaining a DNA sample from the Hayes's genitals would have been highly unusual and that none of the detectives or supervisors involved in the investigation thought of taking such a sample at the time. He explained that they did not ignore Morgan's allegations of rape, but the focus of the investigation was on the homicide and, under the circumstances, there was nothing he could do except get a statement about the rapes from Morgan. It was departmental policy to destroy evidence obtained in a criminal sexual conduct investigation upon the suspect's death. He added that even if DNA had shown that Hayes and Morgan had sex, it could not show whether the sex was consensual.

Stolsonburg's testimony strongly suggests that obtaining a DNA sample from Hayes's genitals was unwarranted because, under the circumstances, any possibility of holding Hayes responsible for his actions ended with his death. Nothing in the detective's testimony suggests

that the police department or the prosecution declined to obtain a DNA sample from Hayes "in a calculated effort to circumvent the disclosure requirements established by *Brady*" or that they were not acting in good faith and in accordance with their normal practices. See *California v Trombetta*, 467 US 479, 488; 104 S Ct 2528; 81 L Ed 2d 413 (1984). Moreover, neither federal law nor Michigan law imposes on the police or the prosecution "an undifferentiated and absolute duty to [collect] and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Youngblood*, 488 US at 58; see also *People v Coy*, 258 Mich App 1, 21; 669 NW2d 831 (2003) (indicating that due process does not "require that the prosecution to seek and find exculpatory evidence"). Although DNA from Hayes's genitals could have been collected, Morgan has not shown that it was an act of bad faith not to do so. Accordingly, she has failed to establish a due-process violation.

Because there was no due-process violation, there is no merit to Morgan's claim that her trial lawyer provided ineffective assistance by failing to request a hearing on the police's bad faith and failing to request an adverse inference instruction. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) ("Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel.").

## VI. OTHER EVIDENTIARY ISSUES

Morgan also asserts that the trial court abused its discretion and violated her due-process right to a fair trial when it allowed the prosecution to introduce into evidence entries from Hayes's journal and all the text messages found on Morgan's cell phone.

Morgan argues that the journal entries were inadmissible hearsay and were not relevant. The trial court ruled that the journal was relevant on the basis of testimony from Hayes's older sister that Hayes carried it with him all the time and kept daily logs, but it had ended up in Morgan's hands. The court also found the journal relevant because its entries were close in time to the fire. The court said that the jury could determine whether the "little dragonfly" to which Hayes wrote most of the entries referred to Morgan. The court further noted that the facts and circumstances arguably suggested that the journal was relevant to Morgan's state of mind. The court admitted the journal and the proffered entries as under MRE 803(3) (then existing mental, emotional, or physical condition) and MRE 803(24) (the catch-all exception).

The prosecution argues that the relationship between Morgan and Hayes was highly probative and implies that the journal entries provided evidence of that relationship. To the extent that the journal entries were offered to "explain the relationship between Defendant and the victim," their probative value depended on the jury's believing what Hayes wrote, i.e., that he loved Morgan, that she insulted and disrespected him, and that their relationship was rocky. Because the journal entries are out-of-court statements offered for the truth of what they said about the relationship, the journal entries were hearsay. See MRE 801(c).

Further, the entries were not admissible under any exception to the hearsay rule because they were not relevant. Relevant evidence is generally admissible, and irrelevant evidence is not admissible. MRE 401 and MRE 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Relevance and materiality are

governed by the relationship of the elements of the charge, the theories of admissibility, and the defenses. *People v Yost*, 278 Mich App 341, 403; 749 NW2d 753 (2008). "[A] victim's state of mind is usually only relevant in homicide cases when self-defense, suicide, or accidental death are raised as defenses to the crime." *People v Smelley*, 285 Mich App 314, 325; 775 NW2d 350 (2009), vacated in part on other grounds 485 Mich 1023 (2010). Morgan did not advance any of these defenses. Because Hayes's state of mind was not relevant, the journal entries were inadmissible for this purpose.

The journal entries—as opposed to the journal itself—were also inadmissible for the purpose of showing Morgan's state of mind. There is no record evidence indicating when Morgan obtained the journal; how she obtained it, i.e., whether Hayes gave it to her or she took it; or whether she was aware of its contents at the time of the fire. Without more information, there is no basis to assert that the content of the journal was relevant to Morgan's state of mind. Because Hayes's state of mind was not relevant, and there is insufficient evidence to surmise that they were relevant to Morgan's state of mind, the trial court abused its discretion by admitting the journal entries under MRE 803(3) and MRE 803(24).

However, a preserved, nonconstitutional error is not ground for reversal unless after examining the entire record, it affirmatively appears more probable than not that the error was outcome-determinative. *People v Lukity*, 460 Mich at 484, 495-496; 596 NW2d 607 (1999). In the present case, there was testimony from Flegel, Kuhnle, and Hayes's sister that Hayes cared deeply for Morgan, but Morgan not only did not return his regard, but could be mean, disrespectful, and insulting toward him. There was testimony from Flegel that Hayes sometimes treated Morgan poorly, that he acted obnoxiously and directed rude comments toward her, and that on one occasion, Hayes groped Morgan in plain sight of everyone. The journal entries' evidence of the complicated relationship between Hayes and Morgan was, therefore, cumulative. Thus, based on the entire record before this Court, we are not convinced that Morgan has met the burden of showing that, but for the entry of the journal entries, it is more probable than not that a different outcome would have occurred.

With respect to the text messages entered into evidence, Morgan argues that some of the messages between herself, Flegel, and Wise were relevant,[1] the vast majority of the messages admitted on rebuttal were irrelevant and inflammatory. The prosecution offered the text messages to rebut the testimony of Rosen, whose testimony for the defense revolved around nonintuitive victim responses to sexual assault, the effects of trauma on memory, and the erroneous

---

[1] At trial, Morgan's lawyer affirmatively stated that he had no objection to admitting into evidence the text messages between Morgan and Flegel. Therefore, appellate review of their admission is foreclosed. See *People v Carter*, 462 Mich 206, 215-216, 219; 612 NW2d 144 (2000). As to Morgan's text messages to and from Wise, we conclude that her implication that some of the text messages between herself and Wise were irrelevant, without identifying the irrelevant messages or addressing their irrelevance, is insufficient to properly present this issue for the Court's consideration. *People v Petri*, 279 Mich App 407, 413; 760 NW2d 882 (2008) (requiring an appellant to support factual statements with specific references to the record). Thus, our review is confined to the remaining text messages that were introduced.

assumptions that result from police interviews that are not trauma-informed. The trial court admitted the text messages at issue to rebut the implication of Rosen's testimony that Morgan's behavior and responses during her police interviews was attributable to the trauma of sexual assault, and because the text messages were probative of Morgan's state of mind at about the time of the fire.

Rosen's testimony implied that Morgan was suffering the effects of trauma after the alleged rape. Morgan's text messages with several unidentified individuals provide evidence from which the jury might reasonably have inferred, first, that Morgan was not raped, and, second, that her conduct and responses during her interviews with the police were not attributable to trauma. This might reasonably factor into the jury's assessment of the relative credibility of Morgan and Flegel. Also relevant to credibility, the texts show Morgan telling Wise that she loved him, while at the same time cultivating a romantic relationship with one of the unidentified individuals that she was texting. The texts did not show Morgan in a favorable light. Nevertheless, given that the text messages were useful to rebut the notion that Morgan's responses to the police arose from trauma, were relevant to Morgan's state of mind before and at about the time of the fire, as well as to her credibility, their probative value was not substantially outweighed by the potential for undue prejudice. Accordingly, the trial court did not abuse its discretion by admitting them into evidence.

## VII. PROSECUTORIAL MISCONDUCT

### A. STANDARD OF REVIEW

Morgan also argues that the prosecutor committed misconduct by impermissibly vouching for the credibility of Flegel, and by offering as evidence Hayes's journal, the text messages, and Seiser's expert opinion testimony. Because this issue is unpreserved, our review is for plain error affecting Morgan's substantial rights. See *Carines*, 460 Mich at 764.

### B. ANALYSIS

A prosecutor may not vouch for the credibility of a witness by implying that she has some special knowledge that the witness is testifying truthfully. *People v Thomas*, 260 Mich App 450, 455; 678 NW2d 631 (2004). Here, the prosecutor asked Flegel on direct examination and on redirect examination what she had told him to do when he came to court, each time eliciting the response, "[t]ell the truth." During her closing argument, the prosecutor told the jury that Flegel "was only told that he needed to come into this court and tell truth." Although Morgan's contends that these statements constitute improper vouching, in neither instance did the prosecution suggest that she had some special knowledge that Flegel was, in fact, testifying truthfully. See *id*. Nor did her questions and argument infringe on the jury's right to decide credibility. Although the prosecutor may have told Flegel to testify truthfully, whether he did so remained a matter for the jury to determine. The trial court made this clear in its instructions to the jury on its obligation to determine which witnesses to believe and how to assess credibility. The court said that in deciding which testimony to believe, the jury should "rely on [its] own common sense and everyday experience." Common sense and everyday experience shows that telling someone to do something does not guarantee that they will do it.

As to Morgan's argument that the prosecutor committed misconduct by seeking admission of Hayes's journal, the various text messages, and Seiser's testimony, "[t]he prosecutor is entitled to attempt to introduce evidence that he [or she] legitimately believes will be accepted by the court, as long as that attempt does not prejudice the defendant." *People v Noble*, 238 Mich App 647, 660-661; 608 NW2d 123 (1999). The evidence that Morgan's challenges in the present case was presented to the jury only after the trial court ruled that it was admissible. Therefore, despite our conclusion that the journal entries were inadmissible, the prosecutor had a basis to legitimately believe that the evidence was admissible and did not commit misconduct by seeking its admission Further, given that the text messages and Seiser's testimony were admissible, the prosecutor did not commit misconduct by introducing that evidence.

## VIII. FAILURE TO INVESTIGATE AND CALL WITNESSES

### A. STANDARD OF REVIEW

Morgan asserts that her trial lawyer's failure to investigate and call witnesses who would testify about Flegel's propensity for lighting fires and impulsive anger constituted ineffective assistance in violation of her state and federal constitutional rights. Whether a defendant has been deprived of the effective assistance of a defense lawyer presents a mixed question of fact and constitutional law. *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). Morgan moved in this Court to remand for an evidentiary hearing, but this Court denied the motion.[2] Therefore, this Court's review is for errors apparent on the record. *See People v Gioglio (On Remand)*, 296 Mich App 12, 20; 815 NW2d 589 (2012), vacated not in relevant part 493 Mich 864 (2012).

### B. ANALYSIS

"Both the Michigan and the United States Constitutions require that a criminal defendant enjoy the assistance of counsel for his or her defense." *Trakhtenberg*, 493 Mich at 51. "In order to obtain a new trial, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *Id.* "In examining whether defense counsel's performance fell below an objective standard of reasonableness, a defendant must overcome the strong presumption that counsel's performance was born from a sound trial strategy." *Id.* at 52. The decision whether to call a witness to testify is a matter of trial strategy. *People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012).

In support of her motion for remand and her claim of ineffective assistance, Morgan attaches to her appellate brief an unsigned, unnotarized "affidavit" in which she asserts that she "provided phone numbers to her attorney of several people who would have testified as to Mr. Flegel's reputation for lighting fires, carrying torches and having an impulsive temper." She also asserts that "[h]er friend Mikey would have testified that Mr. Flegel was known to have burned his aunt's house and was known to carry torches and to frequently light fires." Morgan further

---

[2] *People v Morgan*, unpublished order of the Court of Appeals, entered December 29, 2020 (Docket No. 353557).

asserts that Flegel's brother "could also have given testimony in this regard" and that she believed that Flegel "admitted to his brother that he lit the fire in the present case." Lastly, Morgan states that she "did not want her attorney to stipulate to the preliminary examination testimony of Travis Rynberg." She explained that "Mr. Rynberg is a good friend of hers and she told him everything that happened that night" and opined that he "would have been a very good witness in her defense." Morgan contends that her trial lawyer's failure to investigate and to call additional witnesses cannot be excused as sound trial strategy, "as it greatly harmed [her] changes of an acquittal."

As an initial matter, Morgan's "affidavit" is procedurally insufficient. An affidavit is defined as "[a] voluntary declaration of facts written down and sworn to by a declarant, usu[ally] before an officer authorized to administer oaths." *Black's Law Dictionary* (11th ed). The document that Morgan attached to her appellate brief is unsigned and unnotarized and, therefore, without indication that she swore to the declaration of facts contained therein before an officer authorized to administer such oaths. "[N]ot being notarized or otherwise having been taken before a person having authority to administer an oath or affirmation, the document carries no more weight than a letter outlining defendant's complaints about [her] trial counsel." See *People v Ybarra*, 493 Mich 862 (2012); see also MCR 7.211(C)(1).

Even if Morgan's statement had been properly signed and notarized, the facts asserted are insufficient to establish grounds for remand, let alone to merit vacating Morgan's convictions on the basis of ineffective assistance of counsel. Although Morgan frames this issue as a failure on the part of her lawyer to investigate, Morgan does not assert that her lawyer did not investigate the information she gave him, but that he did not call witnesses she thought would aid her defense. Except for "Mikey" and "Mr. Flegel's brother," these allegedly useful witnesses are not identified.

Even if Morgan had identified the witnesses, there are no specifics regarding their likely testimony, other than that they would have testified about Flegel's "reputation for lighting fires, carrying torches and having an impulsive temper." Michigan's Rules of Evidence allow the credibility of a witness to be attacked or supported by "evidence in the form of opinion or reputation," but limit such evidence to evidence about the witness's "character for truthfulness or untruthfulness." MRE 608(a). Similarly, evidence of a crime—such as burning someone's house—is inadmissible to attack a witness's credibility unless, among other things, the crime contained an element of dishonesty, false statement, or theft. MRE 609(a). Accordingly, MRE 608(a) and 609(a) likely would have precluded the testimony that Morgan asserts Mikey, Flegel's brother, and the unidentified witnesses would have given. As to Rynberg, Morgan's explanation that he is a "good friend of hers and she told him everything that happened that night" and her speculation that he "would have been a very good witness in her defense" cannot overcome the presumption that her lawyer's decision not to call Rynberg to testify at trial was sound trial strategy. See *Trakhtenberg*, 493 Mich at 51. Likewise, Morgan's assertion that she believes that Flegel told his brother that he burned down Hayes's house is too insubstantial to overcome the presumption that the decision not to call Flegel's brother was sound trial strategy.

In light of the foregoing, Morgan has failed to show that, by not calling the witnesses she identified, her trial lawyer's "performance fell below an objective standard of reasonableness." *Trakhtenberg*, 493 Mich at 51. Even if we assumed that her lawyer's performance was objectively deficient, because the testimony she asserts that her proposed witnesses would have given was

inadmissible under MRE 608(a) and 609(a), she cannot show that, but for her lawyer's failure to call these witnesses, the outcome of the trial would have been different.

## XI. DEFENDANT'S STANDARD 4 BRIEF

Morgan raises two additional issues in a Standard 4 brief, neither of which has merit. First, she contends that her right to due process was violated when DeNoon told her that she had failed a polygraph examination, used her confusion about having failed the test to extract more information from her, and kept asking her if she told Flegel that Hayes was already dead. Morgan asserts that DeNoon used her confusion and fear to compel her to make false statements, which ultimately were used at trial. Because this issue is unpreserved, our review is for plain error affecting Morgan's substantial rights. See *Carines*, 460 Mich at 764.

Nothing in the approximately 49 minutes of video provided to this Court, including those statements of DeNoon to which Morgan refers, amounts to coercion warranting relief. The relevant portions of the polygraph interview video show that DeNoon pushed Morgan about whether she told Flegel that Hayes was dead. He implored Morgan to trust him and told her, among other things, that he could advocate for her with the other detectives, that he knew she was not a cold-blooded killer, and that he felt she was not telling him the whole story. He implied that Flegel may have taken what she said too far, and that if she did not clarify the matter, she was going to have to suffer the consequences of setting the fire. DeNoon's tone was neither threatening nor abusive, and even if we were to assume for the sake of argument that what he said was not true, a false statement by an officer that induces a defendant to respond is not alone sufficient to make the statement involuntary. *People v Hicks*, 185 Mich App 107, 113; 460 NW2d 569 (1990). Morgan has failed to show that her responses during the polygraph interview were coerced.

Next, Morgan contends that she was denied a fair trial by the prosecution's unnecessarily admitting into evidence photographs of Hayes's autopsy and the audio of Kuhnle's 911 call. We review these unpreserved issues for plain error affecting defendant's substantial rights. See *Carines*, 460 Mich at 764.

"[P]hotographic evidence is admissible as long as it is relevant, MRE 401, and not unduly prejudicial, MRE 403." *People v Gayheart*, 285 Mich App 220, 227; 776 NW2d 330. Accordingly,

> photographs that are merely calculated to arouse the sympathies or prejudices of the jury should not be admitted. However, if a photograph is otherwise admissible for a proper purpose, it is not rendered inadmissible merely because it brings vividly to the jurors the details of a gruesome or shocking accident or crime. [*People v Howard*, 226 Mich App 528, 549-550; 575 NW2d 16 (1997).]

"Photographs depicting the nature and extent of a victim's injuries may be probative of the defendant's mental state. Photographs also may be admitted to explain or corroborate testimony about the cause of the victim's death." *People v Head*, 323 Mich App 526, 541; 917 NW2d 752 (2018) (citation omitted).

In the present case, the autopsy photographs were admissible to corroborate testimony about Hayes's cause of death and whether he had any external injuries that might be attributable to having been hit with a heavy glass object. Whether Morgan struck Hayes with a bottle was an issue that arose during the investigation of the crime and during trial, as was whether Hayes was dead before the fire started. Some of the autopsy photographs showed that Hayes had suffered an impact of some sort to his head, while others showed Hayes's breathing passages, thus indicating that Hayes was not dead when the fires started. In addition, in order to convict defendant of first-degree arson, the prosecutor had to prove that Morgan burned Hayes's house "willfully and maliciously." Autopsy photographs showing the extent of Hayes's injuries and that he died in part because of smoke inhalation arguably were probative of Morgan's mental state. See *id*. The photographs were gruesome because Hayes's death was gruesome. The record does not suggest, however, that the prosecution submitted them unnecessarily, merely to "arouse the sympathies or prejudices of the jury." See *Howard*, 226 Mich App at 549.

As to the audio of the 911 call, the call was under two minutes and was played for the jury without objection from Morgan. The fact that a juror needed a tissue after hearing the call—considering that it was made by someone under the emotional stress of an emergency situation—is not evidence that the call was unduly and prejudicially emotional. Even if Morgan could establish that playing the call for the jury was plain error because it was unnecessary, she has not established that the less than two-minute call affected the outcome of her eight-day trial. See *Carines*, 460 Mich at 763. Consequently, her claim of error predicated on admission of the 911 call fails.

## X. CUMULATIVE ERROR

Lastly, Morgan suggests that the cumulative effect of the errors identified denied her right to a fair trial. This Court reviews a cumulative-error argument by examining the actual errors identified on appeal to determine whether the errors cumulatively deprived defendant of a fair trial. *People v LeBlanc*, 465 Mich 575, 591 n 12; 640 NW2d 246 (2002). As discussed, the trial court erred by admitting into evidence Wise's hearsay statement and by admitting into evidence entries from Hayes's journal. In both cases, these errors were harmless. Viewing these two errors in light of the untainted evidence, we find no reason to conclude that their cumulative effect was so prejudicial as to warrant vacating Morgan's convictions and remanding for a new trial.

Affirmed.

/s/ Michael J. Kelly
/s/ James Robert Redford